319 P.3d 464

**Lynedon A. VAN NESS,
Petitioner/Claimant–
Appellant**

v.

**STATE of Hawai'i, DEPARTMENT OF
EDUCATION, Respondent/Employer–
Appellee, Self–Insured.**

**No. SCWC–11–0000775.**

Supreme Court of Hawai'i.

Jan. 23, 2014.

As Corrected Feb. 4, 2014.

Wayne H. Mukaida, Honolulu, for petitioner.

Steve Miyasaka, for respondent.

RECKTENWALD, C.J., NAKAYAMA, ACOBA, McKENNA, and POLLACK, JJ.

Opinion of the Court by POLLACK, J.

This appeal arises out of a workers' compensation claim filed by Petitioner/Claimant–Appellant Lynedon Van Ness (Van Ness) with the Director of Labor and Industrial Relations (Director), in which Van Ness sought compensation for the aggravation of his asthma resulting from his exposure to vog at work.[1]

The Director denied his claim, and the Labor and Industrial Relations Appeals Board (LIRAB) affirmed the decision. Van Ness now seeks review of the January 31, 2013 Judgment of the Intermediate Court of Appeals (ICA), affirming the LIRAB's decision. For the reasons set forth herein, we hold that Van Ness is entitled to compensation pursuant to Hawai'i Revised Statutes (HRS) § 386–3(a), governing an injury by disease that is proximately caused by employment. Accordingly, we vacate the ICA's judgment and the LIRAB's decision and remand to the Director for a determination of the amount of compensation to be awarded.

---

1. "Vog is a term that refers to volcanic smog. It is ... caused by a combination of weather, wind conditions and volcanic activity. Vog becomes thicker or lighter depending upon the amount of emissions from Kilauea volcano [on the island of Hawai'i], the direction and amount of wind, and other weather conditions." *Important Informa-tion About Vog,* Governor of the State of Hawai'i, http://governor.hawaii.gov/emergency-information/important-information-about-vog/ (last visited Dec. 11, 2013). *See* Merriam–Webster, http://www.merriam-webster.com/dictionary/vog (last visited Dec. 12, 2013) (defining "vog" as "air pollution caused by volcanic emissions").

## I.  BACKGROUND

The following facts are taken from the record and from Van Ness's testimony at the LIRAB hearing.

### A.

Van Ness was employed by the State of Hawai'i, Department of Education (DOE), as a technology coordinator at Lahainaluna High School (Lahainaluna), on the island of Maui, from July 2005 to November 2006. He had a history of "mild persistent asthma" that he had largely controlled through avoidances and prescribed medications.

In 1989, Van Ness was employed by the DOE as a school teacher on the island of Hawai'i. While teaching in Kona, Van Ness was exposed to vog and "had difficulty breathing and required courses of systemic corticosteroid for rescue along with regular controller medication."

In 1991, Van Ness was transferred to a school on the island of O'ahu and began receiving respiratory treatment from James M. Sweet, M.D. (Dr. Sweet) and Russell M. Tom, M.D. (Dr. Tom). "He was tested and confirmed to have allergic potentials to multiple inhalant allergens including dust mite and mold spores." He was placed on "a several-year course of desensitizing immunotherapy and had [a] favorable outcome."

From 1995 to 2001, Van Ness lived in Idaho, during which he "had few symptoms of allergic-respiratory disease."

Van Ness returned to O'ahu in 2001 and was employed by the DOE as one of two technology coordinators at Leilehua High School. In October 2004, during a trip to California, Van Ness was hospitalized for a diaphragmatic hernia. He also contracted pneumonia during his treatment.

In July 2005, Van Ness was transferred to Lahainaluna to work as the technology coordinator. Lahainaluna had approximately one thousand students and one hundred and fifty staff members. Van Ness was the only technology coordinator at the school and was responsible for maintaining and repairing the technical equipment for the entire school.

Van Ness testified that Lahainaluna is located on the side of a mountain, at the end of Lahainaluna Road. Lahainaluna Road "starts right at the ocean, goes a couple blocks, and then goes up the hill past the intermediate and elementary school to the high school." Lahainaluna's campus was situated at the highest point that Lahainaluna Road reached on the mountain.

Van Ness testified that due to the school's location, the school buildings and classrooms are "kind of spread out and put up against the sides of the mountain in various locations," and there are "stairs that go up the side of the hill." Van Ness estimated that between campus buildings on the lowest and highest point of the mountain, there was an elevation difference of a "couple hundred feet."

Van Ness testified that the staff was not provided with golf carts for transportation, and due to the steepness of the campus terrain and the lack of paved roads, it would have been impractical to attempt to use golf carts for transportation around the school.

Van Ness's office was located in the school library, which was situated at the highest point of the campus. Van Ness was required to repeatedly climb up and down the school stairs daily in order to service the classroom computers at the lower parts of campus. He explained that there were fifty to sixty stairs at the base of the library, another eighty stairs to reach the next level of buildings, about "three or four floors" down to the parking lot, and then another "hike down" to the final section of buildings. The stairs "wrap[ped] around trees" and went "up the side of the hill." There were also "switchbacks, where you go up one way and go the other direction."

Van Ness testified that he was forced to stop to catch his breath as he traveled uphill to his office from the lower campus. It took "about five minutes to go down to [the] admin[istration] [building], [but] like 20 minutes to come back. It's the elevation change in the stairs. It takes quite a bit of effort."

Van Ness was generally present on campus for seven to eight hours a day. Although his office was air conditioned, Van Ness esti-

mated that he spent less than five percent of his time at work in his office. When he was not in his office, Van Ness worked in non-air conditioned environments "all over campus," in buildings with "louvered windows" and "fans ... inside to keep the air circulating." Although many of the classrooms and offices were equipped with air conditioners, most of the units were turned off and the louver windows were left open.

Van Ness explained that his experience working as a technology coordinator at Lahainaluna was different from his experience working in the same position at other schools because he was required to engage in a significant amount of physical activity outside. Additionally, Van Ness testified that the computers at Lahainaluna required more maintenance than computers at other schools because they were exposed to more dust and dirt as a result of the buildings being non-air conditioned and the windows being left open. Van Ness frequently cleaned and replaced the computer filters, which were clogged with dust. Many computers "overheated" because of the lack of circulation and the accumulation of dust. At schools on Oʻahu, he focused on upgrading the computers to "run faster and more efficiently," whereas at Lahainaluna, "it was more an issue of keeping them running."

While Van Ness worked at Lahainaluna, he lived in an air conditioned home in Kihei. The air conditioner had a built-in filter. In addition, Van Ness had several "Bionic Breeze" filter units placed around his home. The units were high-efficiency particulate air (HEPA) filters, and had been recommended by his doctor. Van Ness also had a HEPA filter in his car.

Van Ness testified that there was a significant amount of vog on Maui from late October 2005 through April 2006. On days when the vog was severe, he was unable to see the administrative building "halfway down the campus" from the library. Van Ness also stated that a film of volcanic ash would accumulate on his car and windshield, requiring him to use the windshield wipers to keep the windshield clear while driving.

Van Ness did not have any problems with volcanic ash inside his car or his home. He testified that while living on Maui he spent little time outside, other than when he was at work, as he was "not much of an outdoors person" and "there really wasn't much to do there."

Van Ness testified that in late 2005, his exposure to vog at work affected his respiratory condition by reducing the amount of air he was able to breathe. When the vog was severe, he experienced "a lot of coughing, wheezing." He also caught a cold and contracted bronchitis. Van Ness's shortness of breath worsened when he walked uphill to his office from servicing the computers in the lower campus classrooms. Van Ness described the pain from coughing as "incredibly sharp," "like a stabbing pain."

Additionally, Van Ness explained that when he tried to move around, he would start sweating, his heart began "pounding a lot," and his face "[got] all red." Because Van Ness had to walk to his office and assigned parking spot located at the top of Lahainaluna's campus, "it caused a lot of ... issues with strength, a lot of issues with just being able to breathe." He explained:

> [The vog] basically reduced the amount of air I was able to breathe. And started wheezing and coughing. Real shortness of breath. And obviously the more that happened, the worse it got, to where I basically went level to level and took breaks before I'd continue all the way up. It's steep. There were times when I would drive. It was easier to drive from the library down, around the campus, up to admin, than to actually walk down there.

Prior to the period of severe vog, Van Ness was able to control his asthma condition with a regular inhaler, which he usually did not need to use. Van Ness was prescribed enough medication to last thirteen months. While living on Oʻahu, Van Ness never exhausted the entire thirteen-month supply and only refilled his prescription when the inhalers expired.

While working at Lahainaluna in late 2005, however, Van Ness exhausted his supply of inhalers before his prescription expired, and he was frequently required to refill his inhalers at the pharmacy. However, his inhalers

and other medication were not helping with his breathing.

On December 23, 2005, which was a work holiday during Lahainaluna's winter break, Van Ness traveled to Oʻahu to see Dr. Tom, his primary care physician, about his condition. Dr. Tom's clinical notes include a reference to "vog," although some of the handwriting is illegible. Dr. Tom wrote that Van Ness was experiencing difficulty breathing and coughing. Van Ness testified that after performing x-rays and tests, Dr. Tom diagnosed him with chronic bronchitis.

Van Ness testified that following his visit with Dr. Tom, he was placed on "light duty" at work, which required that he "stay out of the vog whenever [he] could" but did not limit his physical activity.

Van Ness had a follow-up visit with Dr. Tom on January 28, 2006. Dr. Tom's clinical notes indicated that Van Ness's symptoms of coughing, chest congestion, shortness of breath, and wheezing, had "never completely gone away from [the] 12/23/05 visit." Dr. Tom also made note of the possibility of "vog contributing" and "vog on Maui."

On March 4, 2006, Van Ness saw Dr. Sweet, his treating physician for his respiratory condition. Van Ness was still experiencing shortness of breath and wheezing. Dr. Sweet also noted that Van Ness had taken a trip to Pennsylvania and "[w]hile in Philadelphia he was on prednisone. His wheezing and [shortness of breath] essentially resolved. [Van Ness] states as soon as he returned to Maui he started to have wheezing and [shortness of breath]."

On March 10, and 23, 2006, Dr. Tom wrote two notes, addressed "To Whom It May Concern," stating that Van Ness had an asthma condition which was exacerbated by vog. Dr. Tom wrote that Van Ness's symptoms had worsened since moving to Maui due to the higher vog exposure there. Dr. Tom recommended that Van Ness be transferred to Oʻahu due to his condition.

On March 23, 2006, the DOE approved Van Ness's request for a "hardship transfer from Maui District to Oahu District due to medical reasons." However, Van Ness was not immediately transferred.

On May 2, 2006, Van Ness was hospitalized at Queen's Medical Center (QMC) on Oʻahu for surgery on a hernia in his diaphragm. Van Ness testified that the x-ray that Dr. Tom performed of Van Ness's diaphragm in December 2005 had identified a "hole in the diaphragm . . . separating the abdomen from the lungs." He testified that "later it was found that because of all the coughing and wheezing, . . . the tear had gotten a lot larger[.]"

After surgery, Van Ness testified that he experienced various complications, including "post-operative pneumonia, postoperative multi-system organ failure, life threatening pneumonia, advanced respiratory distress syndrome, renal failure, gastrointestinal bleeding, tracheostomy and gangrene." The gangrene "led to amputation of the terminal digits of his first and fifth fingers on the right." Van Ness testified that Paul Morris, M.D. (Dr. Morris), Van Ness's treating physician at QMC, told him that his body would not have been as physically weak post-operation if the DOE had transferred him to Oʻahu in March 2006 when his hardship transfer was approved by the DOE.

Van Ness was discharged from QMC on June 9, 2006. On July 25, 2006, Van Ness returned to work at Lahainaluna.

Van Ness was transferred to Oʻahu in November 2006. Following the transfer, he continued to have respiratory difficulties as his body recuperated from surgery. On June 16, 2007, Dr. Tom restricted Van Ness from "walking too far because that just kept [Van Ness] in a situation of overworking [his] lungs in the recovery period."

B.

On September 20, 2007, Van Ness filed a workers' compensation claim with the Director, stating that "on or about" December 23, 2005, he was exposed to vog during the course of his employment at Lahainaluna, resulting in the "exacerbation of [his] asthma, bronchitis, [and] difficulty breathing." He stated that he had given his employer notice of injury through Joanne Dennis, Lahainaluna's Vice Principal.

On October 12, 2007, the DOE filed a report denying liability for Van Ness's claimed injury "pending further evaluation."

On October 19, 2007, Vice Principal Dennis wrote a letter confirming that prior to December 23, 2005, she had, on several occasions, discussed with Van Ness his difficulties with breathing and asthma that he experienced while working at Lahainaluna. She also verified that "[w]e experienced some unusually severe vog-polluted days during the weeks preceding that winter break." "On some days the atmosphere was so heavy with vog that we could barely see Lahaina town from Lahainaluna High School." She noted that "the vog was even worse" in Kihei, where Van Ness lived. Vice Principal Dennis also "experienced intense headaches during those 'voggy' days," even though she did not have asthma.

Van Ness also testified that he had discussed his medical condition with Vice Principal Lynn Kaholohala prior to December 23, 2005.

### C.

Upon the DOE's request, the Director issued an order on January 11, 2008, requiring Van Ness to submit to an Independent Medical Examination (IME) by Ajit S. Arora, M.D. (Dr. Arora).[2] The IME was conducted on January 25, 2008, and consisted of an "extended interview and examination."[3] No medical records were available for Dr. Arora's review at the time. Dr. Arora submitted his report on February 5, 2008.

As an initial matter, Dr. Arora noted that "[t]he claim apparently is based on the assumption that since exposure to vog occurred also at the school, it is a work related exacerbation of asthma. The legal implications of this are not clear to me because vog is not a factor that is associated with school uniquely."

The majority of Dr. Arora's report reiterated Van Ness's medical history and exposure to vog at Lahainaluna, consistent with Van Ness's testimony at the LIRAB hearing. Dr. Arora stated that "the issues are quite complex." Because Dr. Arora did not have access to Van Ness's medical records, he concluded that "it [would] be unwise to address the [DOE's] referral questions" until he had access to the relevant records. On February 14, 2008, Van Ness was seen by David A. Mathison, M.D. (Dr. Mathison), for a consultation regarding "asthma, allergies, [and] vog effect on lungs." Dr. Mathison prepared a consultation report based on his

2. The DOE asked Dr. Arora to review Van Ness's medical records and to conduct a physical examination in order to address: (1) Van Ness's relevant medical history; (2) whether Van Ness suffered "an industrial injury" as a result of exposure to vog on December 23, 2005; (3) whether the "alleged condition was due in whole or in part to the nature of [Van Ness's] employment with the DOE," or some other pre-existing cause; (4) whether the alleged condition or injury was "temporary in nature"; (5) if the injury is not temporary in nature, whether Van Ness is "expected to have permanent impairment resulting solely from an alleged industrial injury of 12/23/05"; and (6) whether there are any further issues or considerations regarding the alleged injury.

3. Dr. Arora noted that Van Ness, upon advice of counsel, refused to submit to blood work or to testing with an electrocardiogram to assess organ function.

On March 31, 2010, the DOE filed a motion for an order suspending Van Ness's right to claim compensation for failure to comply with HRS § 386–79, based on Van Ness's refusal to have tests done during the IME. Furthermore, the DOE alleged that Van Ness's counsel "revoked medical authorizations" and withheld certain medical records.

On June 23, 2010, the LIRAB denied the DOE's requested order. In the DOE's June 3, 2010 post-hearing trial memorandum filed with the LIRAB, the DOE continued to argue that Van Ness's right to seek compensation should be suspended because of his failure to participate in tests during the IME and his continued withholding of medical records. The LIRAB concluded that it did not need to reach the DOE's argument regarding the suspension of Van Ness's rights to claim workers' compensation benefits.

HRS § 386–79 (1993) provides that "[a]fter an injury and during the period of disability, the employee, whenever ordered by the [Director], shall submit oneself to examination ... by a duly qualified physician or surgeon designated and paid by the employer." The statute further states that "[i]f an employee refuses to submit oneself to, or in any way obstructs, such examination the employee's right to claim compensation for the work injury shall be suspended until the refusal or obstruction ceases and no compensation shall be payable for the period during which the refusal or obstruction continues." *Id.*

interview with Van Ness and his wife, a physical examination of Van Ness, and Van Ness's medical records provided by Dr. Sweet dating back to 1991, which included a summary of Van Ness's hospitalization at QMC in May 2006.

Dr. Mathison first discussed Van Ness's aggravated asthma and noted that after several months on Maui "during a 40–day spell of rainy weather with vog (moisture, pollutants including volcanic smoke/ash) exposure from about November 2005 and continuing into the spring of 2006, [Van Ness] had serious flare of asthmatic symptoms with harsh paroxysms of cough, chest tightness, shortness of breath, and wheeziness[.]" At that time Van Ness's symptoms were "only partially controlled with medications for asthma/bronchitis including Advair, Singulair, and albuterol."

Dr. Mathison wrote that Van Ness's symptoms were complicated by "hernia of the right diaphragm, and urgent surgery was performed at the Queens Medical Center on May 2, 2006." Dr. Mathison also noted the various post-surgery complications Van Ness experienced. He wrote that after being discharged from the hospital, Van Ness had "improved respiratory symptoms, he was able to return to Maui and work there through the remainder of 2006."

Dr. Mathison noted that since moving back to O'ahu, Van Ness "has been relatively free of respiratory symptoms. He … rarely has had need for albuterol and has not regularly taken the Advair."

Dr. Mathison noted that throughout the years, Van Ness's "allergic diathesis has largely been controlled with avoidances and the several-year course of immunotherapy during the early 90s. However, he has had significant asthma exacerbations with exposures to volcanic smoke (high in sulfur dioxide) and ash including that carried by meteorologic[al] conditions holding the pollutant[ ] in moist air over Maui." Dr. Mathison also found that at the time of the consultation, Van Ness's condition had "improved coincident to his residence in Oahu, though he continues to … recover[ ] from complica-

tions of respiratory disease-surgery from near 2 years ago."

In conclusion, Dr. Mathison diagnosed Van Ness with "[m]ild persistent asthma with history of exacerbations with exposures to volcanic smoke-ash-pollution."

Dr. Mathison recommended that Van Ness "continue the regimen of avoidances and medications as prescribed by Dr. Sweet in an attempt to optimally control the allergic-asthmatic disorders." Dr. Mathison wrote, "Of particular concern is the risk for serious and potentially fatal asthma exacerbation with exposure to volcanic products, a well-recognized risk factor for asthmatic patients." (Emphasis added). He concluded that Van Ness "can be considered to be disabled by virtue of his asthmatic tendency and susceptibility to the volcanic pollutant effects and, in accordance with the American Disabilities Act, it behooves his employer not to place him at risk of asthmatic exacerbations by assignments to areas likely to have volcanic exposure-pollution." (Emphasis added).

**D.**

The Director's hearing on Van Ness's claim was held on March 13, 2008.[4] On April 21, 2008, the Director issued a decision denying Van Ness's workers' compensation claim. The Director stated that "[a]fter a review of the evidence presented at the hearing, the Director is not convinced that claimant's injury arose out of and in the course of employment." The Director found that "[Van Ness's] exposure to vog aggravated his long standing asthma condition." However, "[t]he vog was present on the entire island of Maui and not only at claimant's place of employment." The Director found that "it was claimant's exposure to vog on the island of Maui that aggravated his asthma condition," and there was "insufficient evidence" to support Van Ness's "claim that his exposure to vog at only Lahainaluna School was so overwhelming that [Van Ness's] exposure to vog occurred at this place of employment only[.]" The Director therefore did not "find a nexus between the claimant's employment and his injury of 12/23/2005."

---

4. The transcript for the March 13, 2008 hearing     was not made part of the record on appeal.

The Director concluded: "[T]he claimant's respiratory problem and aggravation of his asthma condition was not work related. The Director credits the report of Dr. Arora and the employer's position."

## II. APPEAL TO LIRAB

On May 2, 2008, Van Ness timely filed an appeal from the Director's Decision with LIRAB, pursuant to HRS § 386-87.[5]

### A.

On April 10, 2009, Dr. Arora issued a supplemental report as a follow-up to his initial evaluation of February 5, 2008. The report reviewed records from Dr. Tom from 1994 through 2007, diagnostic reports from the same time period, records from the California hospital where Van Ness was admitted in 2004, and hospital records from January 2005 through October 2006. Dr. Arora wrote that Dr. Tom's records from Van Ness's December 23, 2005 visit noted that Van Ness had experienced a cough for only five days, had difficulty breathing, and requested a refill of his albuterol inhaler. According to Dr. Arora, Dr. Tom did not make any note of the vog as a contributory factor.

Additionally, Dr. Arora found that Van Ness had seen Dr. Tom on December 2, 2005 for a regular checkup and laboratory work-up, and did not report any problem with breathing at that time.

In Dr. Arora's opinion, it was "impossible to determine" if the reported worsening of Van Ness's asthma symptoms in March 2006 was caused by the vog or by the diaphragmatic hernia that worsened around the same time. Dr. Arora stated that he had "not had the opportunity to review the records from Dr. Sweet to determine if objectively there was any change in [Van Ness's] pulmonary status between December 2005 and March 2006 compared to his previous baseline." Nevertheless, Dr. Arora indicated, "I doubt that to be the case." He explained, "Asthma

exacerbation can occur in association with irritant exposure. However, it is a temporary worsening of the symptoms with recovery to baseline. It does not constitute aggravation of the condition."

Dr. Arora concluded that Van Ness's "history is compatible with mild exacerbation of his asthma while in Maui because of vog conditions." Dr. Arora also concluded that the exacerbation of asthma "has no relationship to his employment with the department of education," and "[s]uch exacerbation was temporary and reversible and did not cause any permanent aggravation of his condition." Dr. Arora's opinion was that "there was no occupational injury that occurred in [Van Ness] as a result of employment with [the DOE]."

### B.

On July 1, 2009, the LIRAB issued a Pretrial Order, providing that "[t]he sole issue to be determined is whether Claimant sustained a personal injury to his respiratory system, on December 23, 2005, arising out of and in the course of employment."[6]

The LIRAB hearing on the case was held on April 6, 2010. Van Ness was the only testifying witness at the hearing, and testified as to his asthmatic condition and his experience working at Lahainaluna, as summarized above.

An air quality advisory that was posted on the State of Hawai'i government's website on July 29, 2008 was stipulated into evidence. The advisory stated that the State Department of Health and Hawai'i County Civil Defense had reported "that recent activity at the Kilauea volcano has resulted in some temporary increased levels" of sulfur dioxide and particulates. The advisory provided that the Department of Health "advises that exposure to such elevated levels of sulfur dioxide can pose an immediate health threat to people who have asthma and other respirato-

5. HRS § 386-87(a) (1993) provides in relevant part: "A decision of the director shall be final and conclusive between the parties, ... unless within twenty days after a copy has been sent to each party, either party appeals therefrom to the appellate board by filing a written notice of ap-

peal with the appellate board or the department."

6. The Director's case file was made a part of the LIRAB's record.

ry conditions." (Emphasis added). The advisory further stated that people in "sensitive groups such as those with asthma … can be particularly vulnerable" and that "people reacting to volcanic emissions" should "take protective measures such as staying indoors with the windows closed or relocating to a safe area." The advisory cautioned that people should "avoid physical activity (especially outdoors) such as brisk walking or exercise."

In addition, an undated document entitled "Health Effects," prepared by the Office of the Governor, was also entered into evidence. The document explained that sulfur dioxide is an "irritant gas" that is "a major component of vog." Sulfur dioxide "is usually removed by the nasal passages," and "[m]oderate activity levels that trigger mouth breathing (such as a brisk walk) are needed for [sulfur dioxide] to cause health problems."

The document further stated that "[p]eople with preexisting respiratory conditions are more prone to adverse effects of vog which may include: headaches, breathing difficulties, increased susceptibility to respiratory ailments, watery eyes, and sore throat." Additionally, "[p]eople with asthma who are physically active outdoors are most likely to experience the health effects of [sulfur dioxide]. The main effect, even with a short exposure, is a narrowing of the airways (called bronchoconstriction). This may cause wheezing, chest tightness, and shortness of breath." (Emphasis added).

Both the air quality advisory and the "Health Effects" notice provided that "[t]he long-term health effects of vog are unknown."

### C.

The LIRAB ordered that the parties submit post-trial memoranda in lieu of closing arguments.

### 1.

In his Post Hearing Memorandum, Van Ness argued that he "suffered an aggravation of his asthmatic condition due to having to do strenuous work and breathe outdoor air during a period of high vog concentrations."

He contended that the DOE failed to provide substantial evidence to overcome the presumption of compensability for his workers' compensation claim. Van Ness argued that the aggravation of his asthma met the test for compensability under *Flor v. Holguin*, 94 Hawai'i 70, 81, 9 P.3d 382, 393 (2000), which held that an injury by disease is compensable if the disease (1) is caused by conditions that are characteristic of or peculiar to the particular trade, occupation, or employment, (2) results from the employee's actual exposure to such working conditions, and (3) is due to causes in excess of the ordinary hazards of employment in general.

The DOE countered that Van Ness failed to establish a nexus between his employment and the alleged injury of vog-related asthma. The DOE argued that there was no causal connection between Van Ness's employment and his injury because Van Ness was not required to be at work on the alleged date of injury and his medical records indicated that his respiratory problems were related to his preexisting health condition.

Additionally, the DOE argued that there was no evidence that the vog conditions experienced by Van Ness at work were greater than that experienced by the general population. The DOE also contended that any aggravation of Van Ness's asthmatic condition was temporary in nature as demonstrated by his improved health when he was transferred to O'ahu.

### 2.

On September 20, 2011, the LIRAB issued its Decision and Order, which included its Findings of Fact (FOF) and Conclusions of Law (COL).

With respect to Van Ness's medical records, the LIRAB found that: 1) on March 23, 2007, Dr. Tom "concluded that [Van Ness] suffered from asthma exacerbated by vog while he was on Maui" and recommended that Van Ness move to O'ahu; 2) on February 14, 2008, Dr. Mathison diagnosed Van Ness with "mild persistent asthma with history of exacerbations with exposures to volcanic smoke-ash-pollution"; and 3) Dr. Arora's opinion in his supplemental report was

that "Claimant's history was compatible with mild exacerbation of his asthma because of vog conditions."

The LIRAB entered findings reiterating Van Ness's testimony about Lahainaluna's campus, the vog at work, and his pre-existing asthma condition. However, the LIRAB found that Van Ness faced the same "hazard from vog exposure" at work as the general public, and the DOE had presented substantial evidence to overcome the presumption of compensability:

> 9. The Board finds that Claimant's work or work environment posed no greater vog exposure than that posed to the general public. The hazard from vog exposure Claimant faced while on the campus of Lahainaluna School was no greater hazard or risk than that faced by others off of the campus of Lahainaluna School.
>
> 10. The Board has applied the presumption of compensability and finds that Employer has presented substantial evidence to overcome said presumption.

(Emphases added).

The LIRAB thus concluded that Van Ness "did not sustain a personal injury to his respiratory system, on December 23, 2005, arising out of and in the course of employment." The LIRAB explained that Van Ness "was not at work or even on Maui on December 23, 2005."

"However, inasmuch as Claimant identified his date of injury as 'on or about' December 23, 2005," the LIRAB also concluded that it was "not persuaded by" Van Ness's argument that "his asthma was a compensable disease caused by conditions peculiar to his particular employment." In this regard, the LIRAB concluded that "exposure to vog was not accentuated or made worse by the nature and conditions of Claimant's employment," based on the following reasoning:

> Claimant was a technology coordinator. His risk of exposure to vog was walking outdoors and being in some buildings that

were not air-conditioned. These exposures are no greater than that of the general public. The nature and conditions of his employment did not accentuate the exposure. Rather, the vog was in the air, and the general public breathed the same air.

(Emphasis added).

The LIRAB also rejected Van Ness's claim that, "but for work, he would otherwise have been in a filtered environment at his home." The LIRAB reasoned that "the relevant comparison is made to the general public's exposure, not Claimant's alleged comparatively hermetic and sterile home environment."

Based on the foregoing, the LIRAB concluded that it was unnecessary to address the DOE's argument that Van Ness's "right to claim workers' compensation benefits be suspended because of his refusal to cooperate by undergoing the tests requested by Dr. Arora." [7]

Therefore, the LIRAB affirmed the Director's decision to deny compensation.

### III. APPEAL TO ICA

On October 20, 2011, Van Ness timely filed a Notice of Appeal to the ICA.[8]

#### A.

Van Ness raised three points of error on appeal to the ICA, alleging that the LIRAB erred 1) in entering FOF 9 that his vog exposure at work posed no greater vog exposure or greater hazard or risk than that faced by the general public; 2) by concluding that he did not sustain a personal injury to his respiratory system on December 23, 2005, arising out of and in the course of employment; and 3) by concluding that his exposure to vog was not made worse by the nature and conditions of his employment because the general public breathed the same air.

Van Ness reiterated that the aggravation of his asthma condition was compensable as an injury by disease under the *Flor* test.

---

7. *See supra* note 3.

8. HRS § 386–88 (Supp.2011) provides in relevant part: "The decision or order of the appellate board shall be final and conclusive, ... unless within thirty days after mailing of a certi-

fied copy of the decision or order, the director or any other party appeals to the intermediate appellate court, ... by filing a written notice of appeal with the appellate board."

With respect to the first *Flor* factor, he argued that his preexisting asthma condition should be considered along with the unique nature of his work at Lahainaluna, as compared with the unique nature of his work at Lahainaluna, as compared with the same position at other schools. Second, Van Ness argued that his work required actual exposure to vog, as was found by the LIRAB in FOF 9, and the evidence demonstrated that exposure to vog adversely affected him and exacerbated his asthma. Third, Van Ness contended that the LIRAB erred in comparing his vog exposure to that of the general public, as the general public was not exposed to the vog conditions while being "required to do strenuous work outdoors." The real issue was that "Claimant's job conditions exposed him to a positional or actual risk which resulted in his injury." In this case, the LIRAB's own findings demonstrated that his asthma was exacerbated by vog.

In response, the DOE maintained that Van Ness's claim was non-compensable based on the evidence that Van Ness was exposed to the same air and vog at work as all other persons on Maui. Additionally, the DOE argued that "[a]lthough the medical experts opined that vog exacerbated Claimant's asthma, none of them opined that Claimant's asthma was exacerbated by his employment."

The DOE further contended that while it was unclear whether Van Ness was pursuing his claim as an injury by accident or injury by disease, the LIRAB accurately concluded that Van Ness's injury was not compensable under either alternative. With respect to an injury by accident, the DOE argued that the LIRAB correctly found that there was no nexus between the alleged injury and Van Ness's employment, as Van Ness was not physically present at work or on Maui on the alleged date of injury. In regard to an inju-

ry by disease claim under *Flor*, the DOE maintained that there was "no evidence that [Van Ness's] asthma is characteristic of his occupation as a technology coordinator." The DOE acknowledged that Van Ness "may meet" the second *Flor* requirement, as there was evidence that "Claimant's presence at Lahainaluna School, just as his presence anywhere on the island of Maui, exacerbated his asthma due to the presence of vog." As to the third *Flor* condition, the DOE maintained that there was "no evidence that the aggravation of Claimant's asthma is due to causes in excess of the ordinary hazards or employment in general," as the vog affected the entire island. Therefore, the LIRAB's FOF 9 and FOF 10 were correct.[9]

Van Ness responded that his claim was based on an injury by disease under the *Flor* test. He also argued that the DOE misconstrued *Flor* as requiring "all technology coordinators . . . to have something in their work that causes asthma." Rather, the correct analysis was to determine whether a condition, characteristic to Van Ness's particular job as a technology coordinator at Lahainaluna, caused the exacerbation of his asthma.

## B.

The ICA applied the *Flor* test for providing coverage for injuries caused by an "occupational disease." *Van Ness v. State*, No. CAAP–11–0000775, 128 Hawai'i 497, 2012 WL 6115601, at *4 (Haw.App. Dec. 10, 2012) (mem.). Characterizing Van Ness's claim as a claim that the exacerbation of his asthma resulted from work-related vog exposure, the ICA found that the second condition of the *Flor* test was met because it was "undisputed that Van Ness faced actual exposure to vog in his employment[.]" *Id.* However, the ICA concluded that Van Ness's claim did not con-

---

**9.** Relatedly, the DOE argued that Van Ness failed to challenge FOF 10 as a point of error and that any arguments regarding FOF 10 should therefore be disregarded.

Van Ness responded that his argument should not be disregarded, as FOF 10 was thoroughly discussed as a point of error in the body of his Opening Brief. [RB at 8] Van Ness argued that FOF 10 was clearly erroneous because the DOE did not adduce substantial evidence to overcome the presumption of compensability.

The ICA found that although Van Ness had not raised FOF 10 as a point of error, he had challenged FOF 10 in the argument section of his Opening Brief and provided the necessary information to assist the ICA in identifying his argument. *Van Ness v. State*, No. CAAP–11–0000775, 2012 WL 6115601, at *2 (Haw.App. Dec. 10, 2012) (mem.).

stitute a "compensable occupational disease because the DOE produced substantial evidence" that the first (disease caused by conditions characteristic of employment) and third (disease due to causes in excess of ordinary hazards of employment) conditions of *Flor* were not met. *Id.*

Citing *Flor*, the ICA applied the following standard for compensable occupational diseases:

> [A]n occupational disease requires "a recognizable link between the disease and some distinctive feature of the claimant's job, common to all jobs of that sort." An occupational disease cannot be "an ordinary disease of life to which general public was equally exposed outside of that employment," and the disease must "have incidence substantially higher in that occupation than in usual occupations or, in case of ordinary disease of life, in general population." In other words, the *Flor* test requires that "the employer's working conditions produced the ailment as a natural incident of the employee's occupation in such a manner as to attach a hazard distinct from and greater than the hazard attending employment in general."

*Id.* (citations omitted) (emphasis added).

The ICA found that Van Ness did not meet this test, emphasizing the requirement that the feature causing the disease be "common to all jobs of that sort." *Id.* The ICA reasoned that "Van Ness's occupation was as a technology coordinator, and his primary duties were maintaining and repairing technology equipment." *Id.* at *5. "This work, in and of itself, could not have exacerbated his asthma and Van Ness does not contend that it does." *Id.* Thus, the ICA concluded, "his disease was produced not by 'natural incident' or 'distinctive feature of the claimant's job, common to all jobs of that sort,' but rather by his exposure to vog." *Id.* (citation omitted) (emphasis added). The ICA continued, "Vog exposure itself cannot be considered a condition characteristic of or peculiar to Van Ness's employment, however, because it is undisputed that vog affected the entire island of Maui at the time." *Id.*

The ICA held that the LIRAB's FOF 9, finding that Van Ness's work or work environment posed no greater vog exposure than that posed to the general public, was supported by substantial evidence rebutting the presumption that Van Ness's injury was work-related. *Id.* In this regard, the ICA cited the medical reports, finding that the "reports all concluded the Maui vog exacerbated Van Ness's asthma, but nothing in those reports noted any relationship between the exacerbation and Van Ness's employment." *Id.* (emphases added). Dr. Tom's recommendation that Van Ness transfer to O'ahu rather than to another position on Maui demonstrated that Van Ness's "condition was not peculiar to his employment at Lahainaluna." *Id.* Additionally, the ICA noted the vice principal's statement that she also experienced adverse effects of vog and that the vog was heavier in other parts of Maui. *Id.* Thus, the ICA concluded that Van Ness "faced a risk no different and no greater than that faced by any member of the general public or in another field of work who spent time outdoors." *Id.*

The ICA further emphasized Dr. Arora's conclusion in his supplemental report that Van Ness's exacerbated asthma had "no relationship to his employment with the DOE." *Id.* (brackets and quotation marks omitted). The ICA noted that Dr. Arora reviewed "extensive medical records," which "indicate Van Ness had a complex medical history and numerous health issues," and Dr. Arora "identified a diaphragmatic hernia as a possible cause or contributing factor of Van Ness's exacerbated asthma." *Id.* According to the ICA, "Dr. Arora's reports were sufficiently specific and credible to constitute substantial evidence, and given the complexity of Van Ness's medical history, it was reasonable for the LIRAB to conclude Van Ness's condition was unrelated to his work." *Id.* at *6.

In addition, the ICA found that "[o]ther than Van Ness's own testimony about his work environment and his duties, there is no other evidence in the record suggesting that vog exposure was a hazard peculiar to his employment or in excess of the hazards of employment in general." *Id.*

The ICA therefore concluded that the LIRAB's decision was not clearly erroneous and affirmed the decision. *Id.*

## IV.  APPLICATION

### A.

On April 1, 2013, Van Ness timely filed the Application and presented the following questions for review:

A.  Is the contraction of a disease compensable under HRS § 386–3 although there is no historical association of that disease with that particular line of work?

B.  Are "ordinary diseases of life" compensable under HRS § 386–3?

C.  Should a test similar to the "unitary test" of *Royal State National Insurance Company v. Labor & Industrial Relations Appeal Board,* 53 Haw. 32, 487 P.2d 278 (1971), be applied to "diseases" under HRS § 386–3?

In his Application, Van Ness argued that *Flor* did not limit compensable diseases to those associated with particular trades. Rather, under *Flor,* "causation could be . . . peculiar to the particular 'occupation, or employment'." Thus, the ICA erred in holding that his "claim failed because all technology coordinator positions do not face asthma exacerbation." Van Ness proposed that "[a] test similar to the unitary test of compensability for injury by 'accidents' should also apply to injury by 'disease,' that is, the requirement of HRS § 386–3 is simply that the disease be proximately caused by or result from the nature of employment." At oral argument, counsel for Van Ness maintained that the *Flor* test was met, but also extended this argument by asking the court to reexamine or overrule the three-part *Flor* test and to expressly apply the unitary test to determine the compensability of injuries by disease under HRS § 386–3(a).  MP3: Oral Argument, Hawai'i Supreme Court, at 0:03:00, 0:07:20 (Jun. 20, 213), available at http://state.hi.us/jud/oa/13/SCOA_062013_11775.mp3.

### B.

In response, the DOE maintained that Van Ness, "at most, met one of the three criteria established by *Flor* " but that *Flor* "requires that all three criteria must exist for an occupational disease claim to be compensable."

Alternatively, the DOE argued that the ICA's ruling should be upheld even if it misapplied the *Flor* test because Van Ness's injury also did not meet the requirements for compensability of an injury by accident.  The DOE contended that although "both the Board and ICA decided the case based on the merits of an occupational disease claim, both should have decided the claim as an injury by accident claim."  The DOE emphasized that the LIRAB's pretrial order identifies the issue as whether Van Ness "sustained a personal injury to his respiratory system . . . arising out of and in the course of employment," which "connotes an injury by accident claim."  However, at oral argument, counsel for the DOE stated that although the LIRAB framed the issue as an injury by accident, it was not necessarily the DOE's position that the LIRAB should have decided Van Ness's claim as an injury by accident rather than an injury by disease.  Oral Argument at 00:56:30–00:57:03.

## V.  STANDARDS OF REVIEW

### A.  Board decisions

Appellate review of the LIRAB's decision is governed by HRS § 91–14(g) (1993), which provides that:

Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings;  or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions;  or

(2) In excess of the statutory authority or jurisdiction of the agency;  or

(3) Made upon unlawful procedure;  or

(4) Affected by other error of law;  or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record;  or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*Tauese v. State of Haw., Dep't of Labor & Indus. Relations,* 113 Hawai'i 1, 25, 147 P.3d 785, 809 (2006) (quotation marks and citations omitted).

█ The LIRAB's conclusions of law are reviewed de novo, under the right/wrong standard. *Id.* Its findings of fact "are reviewable under the clearly erroneous standard to determine if the agency decision was clearly erroneous in view of reliable, probative, and substantial evidence on the whole record." *Id.* (quoting *Poe v. Haw. Labor Relations Bd.,* 87 Hawai'i 191, 195, 953 P.2d 569, 573 (1998)) (quotation marks omitted).

### B. Statutory interpretation

█ "The interpretation of a statute is a question of law which this court reviews de novo. When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." *Tauese,* 113 Hawai'i at 26, 147 P.3d at 810 (quotation marks and citations omitted).

### VI. DISCUSSION

HRS § 386–3(a) (Supp.2005) provides, "If an employee suffers personal injury either by accident arising out of and in the course of the employment or by disease proximately caused by or resulting from the nature of the employment, the employee's employer or the special compensation fund shall pay compensation to the employee or the employee's dependents[.]"

█ Pursuant to HRS § 386–85 (1993), for any workers' compensation claim, "it shall be presumed, in the absence of substantial evidence to the contrary ... [t]hat the claim is for a covered work injury." "In workmen's compensation cases, the employer carries a heavy burden." *Lawhead v. United Air Lines,* 59 Haw. 551, 559, 584 P.2d 119, 124 (1978). The presumption imposed by HRS § 386–85 "is not a mere procedural device that disappears upon the introduction of contrary evidence." *Akamine v. Hawaiian*

*Packing & Crating Co.,* 53 Haw. 406, 408, 495 P.2d 1164, 1166 (1972). Rather, "it imposes upon the employer the burden of going forward with the evidence and the burden of persuasion." *Id.* The presumption is rebutted "only by substantial evidence that [the injury] is unrelated to the employment." *Id.*

█ "The term 'substantial evidence' signifies a <u>high quantum of evidence</u> which, at the minimum, must be 'relevant and credible evidence of a quality and quantity sufficient to justify a conclusion by a reasonable [person] that an injury or death is not work-connected.'" *Flor,* 94 Hawai'i at 79, 9 P.3d at 391 (quoting *Akamine,* 53 Haw. at 408, 495 P.2d at 1166) (emphasis added). "If the employer fails to adduce substantial evidence to the contrary, the presumption mandates that the claimant must prevail." *Akamine,* 53 Haw. at 409, 495 P.2d at 1166.

The high burden placed on the employer is attributed to the purpose of the workers' compensation law. "[T]he legislature has decided that work injuries are among the costs of production which industry is required to bear[.]" *Id.* "Workmen's compensation laws were enacted as a humanitarian measure, to create legal liability without relation to fault. They represent a socially enforced bargain: the employee giving up his right to recover common law damages from the employer in exchange for the certainty of a statutory award for all work-connected injuries." *Evanson v. Univ. of Haw.,* 52 Haw. 595, 598, 483 P.2d 187, 190 (1971).

█ Accordingly, "[t]his court has consistently construed § 386–85 liberally in accordance with the humanitarian purposes of workmen's compensation." *Lawhead,* 59 Haw. at 559, 584 P.2d at 124. Thus, "[i]n addition to the presumption of compensability, the broad humanitarian purpose of the workers' compensation statute read as a whole requires that <u>all reasonable doubts be resolved in favor of the claimant</u>[.]" *Id.* at 560, 584 P.2d at 125 (quotation marks and citations omitted) (emphasis added). *See Akamine,* 53 Haw. at 409, 495 P.2d at 1166 ("if there is reasonable doubt as to whether an injury is work-connected, the humanitari-

an nature of the statute demands that doubt be resolved in favor of the claimant").

## A.

In this case, Van Ness alleged that the aggravation of his asthma resulting from his exposure to vog at Lahainaluna was a compensable injury by disease. This court has interpreted HRS § 386–3 broadly to "reflect[ ] the policy of the Workmen's Compensation Law that an employee should be indemnified for all infirmities resulting from his employment." *Royal State Nat'l Ins. Co. v. Labor & Indus. Relations Appeal Bd.*, 53 Haw. 32, 37, 487 P.2d 278, 281 (1971) (emphasis added) (holding that "psychic injuries arising out of the employment relationship" are compensable under the statute). The parties have not contested that the aggravation of Van Ness's asthma would constitute a compensable injury if it was sufficiently connected to his employment.[10]

The parties dispute whether the aggravation of Van Ness's asthma was "proximately caused by or resulting from the nature of the employment." In this regard, the parties have focused on the applicability of the three-part test for occupational diseases established in *Flor v. Holguin*, 94 Hawai'i 70, 9 P.3d 382 (2000), *recon. granted in part*, 94 Hawai'i 92, 9 P.3d 404 (2000).

In *Flor*, the court held that "an employee's injury caused by a disease is compensable as an 'injury by disease,' pursuant to HRS § 386–3, when the disease (1) is caused by conditions that are characteristic of or peculiar to the particular trade, occupation, or employment, (2) results from the employee's actual exposure to such working conditions, and (3) is due to causes in excess of the ordinary hazards of employment in general." 94 Hawai'i at 81, 9 P.3d at 393 (citations omitted). Applying this test, the ICA in this case found that although it was "undisputed

that Van Ness faced actual exposure to vog in his employment, satisfying the second condition," "Van Ness's condition does not fall within the definition of a compensable occupational disease because the DOE produced substantial evidence that the first and third conditions of *Flor* were not met." 2012 WL 6115601, at *4. Similarly, the LIRAB rejected Van Ness's argument that his asthma was a compensable disease, concluding that "[t]he nature and conditions of his employment did not accentuate the exposure" to vog because "the vog was in the air, and the general public breathed the same air."

Inasmuch as the ICA and LIRAB considered whether vog exposure was a natural incident of Van Ness's occupation as a technological coordinator, the analyses reflect a conflation of the injury by disease prong of HRS § 386–3(a). The plain language of HRS § 386–3(a) provides for two distinct ways in which an "injury by disease" may be compensable under the statute: "If an employee suffers personal injury . . . by disease proximately caused by or resulting from the nature of the employment, the employee's employer . . . shall pay compensation to the employee . . . ." (Emphasis added).

Revised Laws of Hawai'i (RLH) § 97–3 (1955), the counterpart to HRS § 386–3, provided that "[i]f a workman receives personal injury . . . by disease proximately caused by the employment, or resulting from the nature of the employment, his employer . . . shall pay compensation[.]" The history of the statute thus demonstrates that disease proximately caused by employment and disease resulting from the nature of employment were intended to be distinct, although related, concepts.

A close reading of *Flor* indicates that the three-part test articulated in that case is not applicable to situations in which the disease is alleged to be "proximately caused by"[11]

---

10. In the context of workers' compensation, "[t]he term 'disease' [has been] construed in its broadest dictionary meaning of any 'serious derangement of health' or 'disordered state of an organism or organ.'" A. Larson, Workers' Compensation Law § 52.04[2] (2012) [hereinafter Larson's]. *See* Black's Law Dictionary 535 (9th ed. 2009) (defining "disease" as a "deviation from the healthy and normal functioning of the

body," "[a]ny disorder; any depraved condition").

11. *See Black's Law Dictionary* 250 (9th ed. 2009) (defining "proximate cause" as "[a] cause that is legally sufficient to result in liability"); *Montalvo v. Lapez*, 77 Hawai'i 282, 287 n. 5, 884 P.2d 345, 350 n. 5 (1994) ("For our purposes, the terms

the employment, rather than alleged to "result[ ] from the nature of the employment."

In *Flor*, the claimant filed a workers' compensation claim upon being diagnosed with the hepatitis C virus after decades of working as a dental hygienist for numerous dentists and periodontists. *Id.* at 74, 9 P.3d at 386. There was significant evidence demonstrating that the claimant "probably had acquired hepatitis C through work exposure to contaminated blood." *Id.* However, there was "no test or procedure that could reliably isolate either the time of first infection with hepatitis C or the source of the infection," and the claimant was "unable to recall, identify, or otherwise determine the date on which she contracted hepatitis C." *Id.* Given the multiple employers and lengthy time period involved, and the inability to isolate the event precipitating the disease, the court stated that it would analyze the claim as an "injury by disease," *id.* at 83–85, 9 P.3d at 395–97, and defined an "injury by disease" as an injury that "generally developed gradually over a long period of time" as opposed to "result[ing] from a discrete event." *Id.* at 78, 9 P.3d at 390.

Although the court then characterized the issue before it as "constru[ing] the causation requirements applicable to the 'injury-by-disease' prong of HRS § 386–3," *id.* at 80, 9 P.3d at 392, the court was clearly focused on the "resulting from the nature of the employment" prong of injuries by disease. Thus, the court defined an "occupational disease" as a disease "resulting from the nature of the employment." *Id.* at 80, 9 P.3d at 392 (citing *Komatsu v. Bd. of Trustees, Employees' Ret. Sys.*, 5 Haw.App. 279, 284, 687 P.2d 1340, 1344 (1984)) (emphasis added). The court further developed the definition of an "occupational disease," explaining that " 'an ailment does not become an occupational disease simply because it is contracted on the employer's premises.' " *Id.* (quoting *Anderson v. General Motors Corp.*, 442 A.2d 1359, 1360 (Del.1982)) (brackets omitted). Rather,

> [t]here must be a recognizable link between the disease and some distinctive feature of the claimant's job, common to all

'legal cause' and 'proximate cause' are synony-

jobs of that sort. In other words, an ailment or disease is a compensable occupational disease if the employer's working conditions produced the ailment as a natural incident of the employee's occupation in such a manner as to attach a hazard distinct from and greater than the hazard attending employment in general.

94 Hawai'i at 80, 9 P.3d at 392 (emphases added) (citations and quotation marks omitted). The *Flor* court then announced its three-part test for compensating an employee's injury caused by disease under HRS § 386–3(a). *Id.* Based on the facts of that case, the court determined that the claimant's "disability, caused by hepatitis C," was compensable "inasmuch as the Employers failed to demonstrate by substantial evidence that Flor's disease (1) was not caused by conditions that were characteristic of or peculiar to her employment as a dental hygienist, (2) did not result from her actual exposure to such conditions, and (3) was not due to causes in excess of the ordinary hazards of employment in general." *Id.* at 84–85, 9 P.3d at 396–97.

The *Flor* court distinguished its three-part test from the "unitary" or "nexus" test used for determining the compensability of injuries "by accident." *Id.* at 80, 9 P.3d at 392. The unitary test "considers whether there is a sufficient work connection to bring the accident within the scope of the statute," and "requires the finding of a causal connection between the injury and any incidents or conditions of employment." *Tate v. GTE Hawaiian Tel. Co.*, 77 Hawai'i 100, 103, 881 P.2d 1246, 1249 (1994).

The *Flor* court did not examine whether the claimant's injury by disease was compensable under the proximate cause analysis due to the factual nature of the case. However, the court did not preclude circumstances in which an injury by disease claim would be compensable under a proximate cause analysis. On the contrary, the *Flor* court expressly stated that "[w]hen a disease causing injury results from an identifiable accident," or from a "discrete event—the time and place of which can be fixed," "rather than from a

mous[.]' ").

peculiar risk of the employment, <u>it should be compensated as an accidental injury.</u>" *Id.* at 78, 9 P.3d at 390 (emphasis added). Thus, the purpose of the *Flor* test was to expand coverage under HRS § 386-3 in a case where the claimant would not have been able to show proximate cause under the unitary test; the purpose was not to supplant the proximate cause analysis.[12]

■ Accordingly, the *Flor* test for compensability is limited to determining the compensability of injuries by disease "resulting from the nature of the employment." For injuries by disease "proximately caused by" the employment, we continue to apply the unitary test.[13]

### B.

■ The relevant issue under the unitary or "work-connection approach" is simply whether there is a causal connection between the injury and any incidents or conditions of employment:

> The work-connection approach rejects the necessity of establishing temporal, spatial, and circumstantial proximity between the injury and employment. Instead, focusing on the injury's origin rather than the time and place of its manifestation, the work-connection approach simply requires the finding of a <u>causal connection between the injury and any incidents or conditions of employment.</u>

*Chung v. Animal Clinic, Inc.*, 63 Haw. 642, 648, 636 P.2d 721, 725 (1981) (emphasis added). "[C]ompensation is awarded if the injury reasonably appears to have flowed from the conditions under which the employee is required to work." *Royal State Nat'l Ins. Co. v. Labor & Indus. Relations Appeal Bd.*, 53 Haw. 32, 37–38, 487 P.2d 278, 281–82 (1971).

In *Akamine*, 53 Haw. at 407–08, 495 P.2d at 1165–66, the court held that the employer and insurance carrier failed to overcome the presumption of compensability, where an employee died of a heart attack at work while he unloaded, stacked and handtrucked cargo. The LIRAB had denied the workers' compensation claim filed by the employee's dependents, reasoning that the employee's death "was due to his cardiovascular disease of long standing and that it was not attributable to his employment[.]" *Id.* at 407, 495 P.2d at 1165.

---

12. This is consistent with the purpose of occupational disease legislation generally. The distinction between injuries by accident and by disease originally developed because occupational diseases were excluded from coverage under early workers' compensation laws. *See* Larson's § 52.02.

   Workers' compensation statutes "were designed to substitute no-fault coverage for common law fault remedies," which provided coverage for "accidental" injuries. 2 Employment Law § 7.24 *Occupational disease* (4th ed.). "Because occupational diseases were not conditions subject to tort liability, state legislatures did not address those particular problems," and most early court decisions did not allow coverage for non-accidental illnesses. *Id.* "[T]he earliest kind of occupational disease coverage in the United States," beginning in the early 20th century, "took the form of general inclusion within the term 'injury' or within the term 'disease'." Larson's § 52.02.

   However, "[w]ith the expansion of occupational disease legislation, [the] contrast between accidental and occupational disease is gradually losing its importance, and awards are frequently made without specifying which category the injury falls in." *Id.* at § 52.03[1]. "Jurisdictions having general coverage of occupational disease now usually define the term to include any disease arising out of exposure to harmful conditions of the employment, when those conditions are present in a peculiar or increased degree by comparison with employment generally." *Id.* at § 52-1.

13. This court has previously applied the unitary test in cases involving the compensability of an injury resulting from a disease or the aggravation of a pre-existing disease, without explicitly identifying whether it considered the injury to be an injury by accident or by disease under the statute. *See Akamine*, 53 Haw. 406, 495 P.2d 1164 (awarding compensation for aggravation of heart condition resulting in death); *Lawhead*, 59 Haw. 551, 584 P.2d 119 (holding that "a disease or illness such as influenza is an injury within the meaning of § 386-3" and awarding compensation because employee "contracted influenza as a result of her employment"). *See also Chung*, 63 Haw. 642, 636 P.2d 721 (applying work-connection test to determine that claimant's heart attack arose out of and in the course of employment based on evidence that claimant's employment activities engaged claimant for long hours and "generated a substantial amount of mental and emotional stress which is strongly linked to the production of heart disease").

In reviewing this decision, the court noted that "[b]ecause of the relatively higher degree of uncertainty surrounding causation of heart diseases, the strength of the presumption is especially formidable" in "cardiac cases." *Id.* at 409, 495 P.2d at 1167. The court explained that the presumption "signals and reflects a strong legislative policy favoring awards in arguable cases." *Id.* In *Akamine,* there was medical testimony by two expert witnesses. *Id.* at 409–10, 495 P.2d at 1167. One expert testified that there was no connection between the employee's death and his employment, based "on his belief that heart diseases originate relatively early in one's life and [the employee's] pre-existing pathological condition was the sole cause of death." *Id.* at 410–11, 495 P.2d at 1167 (footnote omitted). The expert further testified that the employee's job was not "extremely exertional" and would not have precipitated a heart attack. *Id.* at 411, 495 P.2d at 1168.

The court determined that it would give "little probative weight" to such testimony. *Id.* at 410–11, 495 P.2d at 1167–68. The court reasoned that "while it may be sound medically to say that the work did not 'cause' the attack, it may be bad law, because, [i]n general, existing law treats the slightest factor of aggravation as an adequate 'cause'." *Id.* at 410, 495 P.2d at 1167 (emphasis added). Thus, it was "legally irrelevant" whether the employee's heart attack "might have occurred at home, on the street or elsewhere while tending to his private affairs. The only consideration should have been whether the attack in fact was aggravated or accelerated by his work activity." *Id.* at 413, 495 P.2d at 1169 (emphasis added).

Based on this standard, the court found that a doctor's testimony that he was unable to render an opinion as to whether the heart attack was related to the employee's work activity "represents a salient index of the absence of substantial evidence to the contrary." *Id.* at 414, 495 P.2d at 1169 (emphasis added). The court found that the employee's claim was compensable, and reversed and remanded for a determination of the amount of the award. *Id.* at 414, 495 P.2d at 1170.

Following *Akamine,* this court has continued to hold that "the slightest aggravation or acceleration of an injury by the employment activity mandates compensation." *DeFries v. Ass'n of Owners, 999 Wilder,* 57 Haw. 296, 309, 555 P.2d 855, 862 (1976) (holding that claimant was entitled to recover for injuries resulting from stumble that aggravated or accelerated the arthritic condition of his knee). *See Chung,* 63 Haw. at 651–52, 636 P.2d at 727–28 (claimant's heart attack was aggravated or accelerated by work activity); *Flor,* 94 Hawai'i at 85, 9 P.3d at 397 (applying principle that primary focus of medical testimony is "whether employment situation in any way contributed to the employee's injury"); *Korsak v. Haw. Permanente Med. Group, Inc.,* 94 Hawai'i 257, 260, 12 P.3d 357, 360 (App.1999) (applying slightest aggravation test and comparing facts to *Akamine,* which held that "[t]he primary focus of the medical testimony should have been a discussion on whether the employment effort, whether great or little, in any way aggravated [the] heart condition which resulted in his death") (quotation marks and citation omitted).

In *Lawhead,* 59 Haw. at 558, 584 P.2d at 124, the court held that "[i]n view of the broad scope of [HRS § 386–3], . . . a disease or illness such as influenza is an injury within the meaning of § 386–3." In that case, the claimant was a flight attendant. *Id.* at 553, 584 P.2d at 121. On a certain flight, she "worked in the galley section of the aircraft where the temperature was extremely low." *Id.* During a stopover, she stayed in accommodations arranged by her employer, where the air was very dry due to a "defective heating and air-conditioning system." *Id.* She woke up the next day with a "dry and sore throat" and upon returning home she was diagnosed with influenza. *Id.*

Based on these facts, the court held that the claimant was entitled to compensation. *Id.* at 560, 584 P.2d at 125–26. The court rejected the employer's contention that the claim should be denied because the claimant "failed to show that she was exposed to an increased risk attributable to work." *Id.* at 560, 584 P.2d at 125. The court noted that a nearly identical argument was rejected as

legally irrelevant in *Akamine,* and explained, "The relevant point is not whether a claimant would more likely have suffered an injury at work than elsewhere but whether her injury occurring in the course of employment was work related." *Id.* In announcing its holding, the court referenced the statutory language for injuries by disease: "[T]here was evidence that she suffered from an illness proximately caused by or resulting from the nature of her employment. Since United failed to present substantial evidence to rebut the presumption that her claim was for a covered work injury, appellee must prevail." *Id.* at 560, 584 P.2d at 125–26 (emphasis added).

### C.

In this case, the DOE failed to present substantial evidence to overcome the statutory presumption of compensability. As stated, "[t]he statute nowhere requires ... some preliminary showing ... before the presumption will be triggered. Rather, HRS § 386–85 clearly dictates that coverage will be presumed at the outset, subject to being rebutted by substantial evidence to the contrary." *Chung,* 63 Haw. at 650–51, 636 P.2d at 727.

Here, the evidence was undisputed that Van Ness had a pre-existing asthma condition. It was also undisputed that exposure to vog aggravated Van Ness's condition. Dr. Mathison diagnosed Van Ness with "[m]ild persistent asthma with history of exacerbations with exposures to volcanic smoke-ash-pollution," and Dr. Tom recommended that Van Ness be transferred out of Maui because of his "asthma condition, which is exacerbated by vog." Dr. Arora's supplemental report concluded that Van Ness's medical history is "compatible with mild exacerbation of his asthma while in Maui because of vog conditions."

The State's 2008 advisory further recognized that elevated levels of sulfur dioxide as a result of volcanic emissions "pose an immediate health threat to people who have asthma and other respiratory conditions." The State's "Health Effects" notice confirmed that "[p]eople with asthma who are physically active outdoors are most likely to experience the health effects of [sulfur dioxide]," which may include "wheezing, chest tightness, and shortness of breath." Van Ness testified to experiencing such health effects when exposed to vog at work. Thus, his asthma condition was clearly exacerbated and aggravated by exposure to vog.

It was further undisputed that Van Ness faced actual exposure to vog while employed at Lahainaluna. This was recognized by both the LIRAB and the ICA. The LIRAB found that Van Ness's "work or work environment posed no greater vog exposure than that posed to the general public," (emphasis added), implicitly finding that Van Ness was exposed to vog at work, while the ICA expressly stated that it was "undisputed that Van Ness faced actual exposure to vog in his employment." 2012 WL 6115601, at *4. Additionally, there was evidence that the vog on Maui was particularly severe around December 2005. Vice Principal Dennis, who did not have a pre-existing asthma condition, confirmed that she "experienced intense headaches" during that time because of the vog.

Finally, Van Ness testified that his exposure to vog at Lahainaluna, coupled with the requirements of his employment, the layout of the campus, and the severity of the vog in late 2005, caused his condition to worsen. Van Ness's employment as a technology coordinator at Lahainaluna was affected by the campus' location and layout. Lahainaluna's campus is situated on a mountain side, with stairs providing most of the access to the school buildings. Van Ness's office was located at the highest elevation point of the campus. During the seven to eight hours a day that he was generally present on campus, Van Ness estimated that he spent less than five percent of his time in his office. In order to service the computers at the lower parts of the campus, Van Ness was required to repeatedly climb up and down the school stairs daily. He estimated that there were 140 stairs or about "three or four floors" down to the parking lot, and then another "hike down" to the final section of buildings. The stairs went "up the side of the hill" and there were also "switchbacks." Van Ness explained that it took "quite a bit of effort" and about twenty minutes for him to get back to his office from the administration building.

Van Ness testified that the exposure to vog caused many issues with "strength" and his ability to breathe. He testified that when the vog was severe, he experienced coughing and wheezing, as well as a "sharp" "stabbing pain" from coughing. This made it very difficult for him to move around the Lahaina-luna campus. His coughing worsened when he walked uphill and climbed stairs back to his office from the lower campus, and he would have to take breaks between stair levels because of the coughing and wheezing that the vog caused.

■ Accordingly, it is clear that the "effort or strain" Van Ness experienced with his respiratory condition as a result of vog exposure "occur[ed] during the course of the employment and as an ordinary or usual incident of the work," given that his employment required strenuous activity and the strenuous activity caused the exacerbation of his asthma. *Akamine*, 53 Haw. at 413, 495 P.2d at 1169. The LIRAB's finding that Van Ness's "work environment posed no greater vog exposure than that posed to the general public" is inapposite, inasmuch as the "relevant point is not whether [Van Ness] would more likely have suffered an injury at work than elsewhere[,] but whether [his] injury occurring in the course of employment was work related." *Lawhead*, 59 Haw. at 560, 584 P.2d at 125–26.

The evidence offered by the DOE to rebut the statutory presumption was Dr. Arora's opinion in his supplemental report that the exacerbation of Van Ness's asthma was "temporary and reversible." However, as the court held in *Akamine*, "existing law treats the slightest factor of aggravation as an adequate 'cause'" of injury. 53 Haw. at 410, 495 P.2d at 1167 (emphasis added).

■ Dr. Arora also concluded that it was "impossible to determine" if the exacerbation of Van Ness's asthma was caused by the vog or by the diaphragmatic hernia that developed around the same time. While the ICA relied on this opinion to conclude that Dr. Arora's reports constituted substantial evidence for the LIRAB to conclude that Van Ness's condition was unrelated to work, 2012

WL 6115601, at *6, the LIRAB did <u>not</u> rely on Dr. Arora's opinion in this regard. Furthermore, Dr. Arora's opinion that it was impossible to determine the cause of the aggravation does not constitute substantial evidence rebutting the presumption. On the contrary, pursuant to *Akamine*, doubt as to the cause of the injury "represents a salient index of the <u>absence of substantial evidence</u>" required to overcome the presumption that the claim is compensable. 53 Haw. at 414, 495 P.2d at 1169 (emphasis added). In any event, the presumption of compensability and "the broad humanitarian purpose of the workers' compensation statute ... requires that <u>all reasonable doubts be resolved in favor of the claimant</u>." *Lawhead*, 59 Haw. at 560, 584 P.2d at 125 (quotation marks and citations omitted) (emphasis added).

The LIRAB, however, found that the "hazard from vog exposure [Van Ness] faced while on the campus of Lahainaluna School was no greater hazard or risk than that faced by others off of the campus," and concluded that "[t]he nature and conditions of [Van Ness's] employment did not accentuate the exposure. Rather, the vog was in the air, and the general public breathed the same air."

■ As discussed, the evidence overwhelmingly demonstrated that Van Ness's exposure to vog at work, combined with the surrounding circumstances of his employment and his pre-existing condition, resulted in the exacerbation of his asthma. Thus, the aggravation of Van Ness's asthma was causally connected to the "incidents or conditions" of his employment. *See Chung*, 63 Haw. at 648, 636 P.2d at 725 ("the work-connection approach simply requires the finding of a causal connection between the injury and any incidents or conditions of employment"). The LIRAB's finding and conclusion failed to properly consider Van Ness's pre-existing condition and the fact that the general public was not exposed to the vog in the same manner as Van Ness. Therefore the LIRAB's finding is clearly erroneous and the conclusion of law is wrong.[14]

14. It is somewhat unclear what standard the LIRAB applied in denying Van Ness's claim, as

the LIRAB referenced language consistent with *Flor* as well as language referring to the statutory

The DOE failed to present substantial evidence to overcome the presumption that the aggravation of Van Ness's asthma was an injury "by disease proximately caused by" his employment. *See Miyamoto v. Wahiawa General Hosp.*, 101 Hawai'i 293, 310–11, 67 P.3d 792, 809–10 (App.2003) (holding that LIRAB misapplied statutory presumption that claimant's injuries were work-related, reversing LIRAB's judgment and remanding for a determination of the amount of compensation to be awarded); *Korsak v. Haw. Permanente Med. Group, Inc.*, 94 Hawai'i 257, 261–62, 12 P.3d 357, 361–62 (App.1999) (reversing LIRAB's decision denying benefits and remanding for determination of compensation and apportionment, given that undisputed facts were not sufficient "to constitute substantial evidence to rebut the presumption" of compensability), *affirmed by* 94 Hawai'i 297, 309, 12 P.3d 1238, 1250 (2000) (affirming ICA's reversal of LIRAB decision and ICA's remand to the LIRAB for determination of compensation and apportionment); *DeFries*, 57 Haw. at 309, 555 P.2d at 863 (reversing LIRAB's judgment and remanding for determination of amount of compensation); *Akamine*, 53 Haw. at 415, 495 P.2d at 1170 (same).

Accordingly, Van Ness's claim is for a covered work injury under HRS § 386–3.

## VII.

Based on the foregoing, we vacate the ICA's judgment and the LIRAB's decision and order. The case is remanded to the LIRAB for a determination of the amount of compensation to be awarded.[15]

standard for accidental injuries. As stated, the LIRAB erred in applying the *Flor* test. The LIRAB also erred in the way it applied the unitary work-connection test.

The LIRAB's pretrial order characterized the claim as an injury by accident, and the LIRAB's decision concluded that Van Ness "did not sustain a personal injury to his respiratory system, on December 23, 2005, arising out of and in the course of employment." The LIRAB's basis for its conclusion was simply that Van Ness "was not at work or even on Maui on December 23, 2005." However, as stated, the work-connection approach "rejects the necessity of establishing temporal, spatial, and circumstantial proximity between the injury and employment." *Chung*, 63 Haw. at 648, 636 P.2d at 725. The focus is on the "injury's origin rather than the time and place of its manifestation." *Id.* Accordingly, the LIRAB clearly erred in its application of the unitary test.

15. As appropriate, the LIRAB may consider the DOE's argument regarding the suspension of Van Ness's right to claim workers' compensation benefits. *See supra* note 3.