**Electronically Filed
Intermediate Court of Appeals
CAAP-13-0001097
21-JAN-2016
07:49 AM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---

SAM C. YADAO, Claimant-Appellant, v.
STATE OF HAWAI'I, DEPARTMENT OF LAND AND NATURAL
RESOURCES, Employer-Appellee, Self-Insured

NO. CAAP-13-0001097

APPEAL FROM THE LABOR AND INDUSTRIAL RELATIONS APPEALS BOARD
(CASE NO. AB 2012-182(K) (4-11-10052))

JANUARY 21, 2016

FUJISE, PRESIDING JUDGE, LEONARD AND GINOZA, JJ.

OPINION OF THE COURT BY LEONARD, J.

Claimant-Appellant Sam C. Yadao (**Yadao**) appeals from the Labor and Industrial Relations Appeals Board's (**LIRAB's**): (1) Order Denying Claimant's Motion to File After Trial, filed on December 7, 2012 (**December 7, 2012 Order**); (2) Decision and Order, filed on March 1, 2013 (**Decision and Order**); and (3) Order Denying Motion to Reopen Record and for Reconsideration, filed on May 10, 2013 (**May 10, 2013 Order**).

The LIRAB concluded that Yadao (1) sustained an injury to his left knee in the form of chondromalacia patella arising out of and in the course of his employment on August 27, 2010 and

(2) did not sustain an injury to his left knee arising out of and in the course of his employment on March 17, 2011. In doing so, the LIRAB reversed the decision of the Director of Labor and Industrial Relations (**Director**), which denied Yadao's claim for worker's compensation benefits for the August 27, 2010 injury and sustained worker's compensation benefits for the March 17, 2011 injury.

Yadao asks the Court to vacate, in part, the LIRAB's Decision and Order, specifically with respect to the compensability of the March 17, 2011 date of injury, and find that Yadao sustained a personal injury arising out of and in the course of employment on March 17, 2011. We vacate the LIRAB's determination of Yadao's March 17, 2011 claim and remand for proceedings consistent with this order. We otherwise affirm the LIRAB's Decision and Order and the December 7, 2012 Order. In addition, we vacate the LIRAB's May 10, 2013 Order and remand for further proceedings, with instructions that the LIRAB consider the October 16, 2012 MRI report.

I.   BACKGROUND

Yadao was employed by the State of Hawaiʻi, Department of Land and Natural Resources (**DLNR**), as a Forestry Worker, on the island of Kauaʻi. Yadao's responsibilities included trail maintenance, weed whacking, and responding to forest fires. While performing general trail maintenance, Yadao carried a thirty to fifty pound backpack which contained water, gas, and personal protective equipment.

On August 27, 2010, Yadao was responding to a forest fire on Mauna Kea, on the island of Hawaiʻi (**Big Island**). Yadao was carrying a fifty-pound backpack which included a first-aid kit, fire shelter, radio, lunch, hand tools, and other forest fire-fighting gear. While walking on steep, uneven, and unstable terrain, Yadao fell and hit his left knee on a rock. Yadao continued to work after the fall. Yadao reported the injury to his supervisor on August 31, 2010. Following the August 27, 2010 injury, Yadao did not seek treatment for his left knee.

On or around September 3, 2010, Yadao filed a WC-1: Employer's Report of Industrial Injury for an August 27, 2010 injury. Yadao claimed that he tripped and landed on his knees on lava rocks while "hiking to the fire line with backpack, pump and hand tools."

During the week of March 14, 2011, Yadao was performing maintenance on the Nualolo trail located in Koke'e State Park on the island of Kaua'i. During the week of March 14, 2011, Yadao worked from Monday to Thursday for four hours a day. Yadao did not work on Friday, March 18, 2011, because it was a furlough day.[1] Yadao testified that the Nualolo trail is about four miles. Yadao testified that the first half mile of the Nualolo trail is straight down. After the first half mile, the trail flattens out and then gradually declines. Yadao's duties that week consisted of cutting grass, brushing sides, and picking up branches off the trail. During the week of March 14, 2011, Yadao felt a pinching and poking sensation in his left knee. On March 18, 2011, Yadao felt excruciating pain in his left knee.

On Monday, March 21, 2011, Yadao visited his primary care physician, Dr. David Zimmerman (**Dr. Zimmerman**). In his report, Dr. Zimmerman noted "left knee internal derangement." Dr. Zimmerman noted "very mild degenerative changes are present. No fracture or loose body is noted." Dr. Zimmerman referred Yadao to orthopedic surgeon, Dr. Richard Goding (**Dr. Goding**).

Dr. Goding performed a physical examination on March 30, 2011. In his report dated April 4, 2011, Dr. Goding wrote that Yadao reported that he "fell onto both knees while he was fighting fire in August, and he now has pain on the medial side of the left knee." Dr. Goding noted severe medial joint line tenderness on Yadao's left knee and diagnosed Yadao with a medial

---

[1]     On June 24, 2009, Governor Linda Lingle issued executive order 09-02. Haw. Gov't Emp. Ass'n v. Lingle, 124 Hawai'i 197, 200, 239 P.3d 1, 4 (2010). Executive order number 09-02 defined a "furlough" as "the placement of an employee temporarily and involuntarily in a non-pay and non-duty status by the Employer because of lack of work or funds, or other non-disciplinary reasons." Id. at 200 n.4, 239 P.3d at 4 n.4.

meniscus tear. Dr. Goding noted "[w]e will organize an MRI and see him back."

Upon DLNR's request, Dr. Kent Davenport (**Dr. Davenport**) performed an independent record review on July 8, 2011. Dr. Davenport noted his impressions as:

1. Medial meniscus tear, left knee, unrelated to the subject accident of 08/27/10.
2. Morbid obesity.
3. Previous history of bilateral knee pain.

Dr. Davenport concluded that Dr. Zimmerman's finding of acute pain suggested that it was not related to the August 27, 2010 injury. Dr. Davenport wrote that a morbidly obese male with such an injury would be expected to experience severe discomfort within a week following the injury. Dr. Davenport concluded that it was not probable that Yadao sustained a meniscal tear on August 27, 2010.

Upon the request of Yadao's counsel, Dr. Wayne K. Nadamoto (**Dr. Nadamoto**) performed a physical examination and reviewed the reports of Dr. Zimmerman, Dr. Goding, Dr. Sydney G. Smith (**Dr. Smith**), and Dr. James F. Scoggin, III (**Dr. Scoggin**), on July 9, 2012. In a report dated July 23, 2012, Dr. Nadamoto diagnosed Yadao with chondromalacia[2] patella[3] of the left knee and a probable meniscus[4] tear of the left knee. Dr. Nadamoto noted that the chondromalacia patella was caused by the August 27, 2010 fall on the patella, that Yadao continued to work because the symptoms were tolerable, and that the March 17, 2011 accident was "more severe in nature" and "caused a possible tear of the meniscus." Dr. Nadamoto also noted that after March 17,

---

[2] "Chondromalacia" is defined as a "softening of the articular cartilage, most frequently in the patella." The Sloane-Dorland Annotated Medical-Legal Dictionary 140 (1987).

[3] "Patella" is defined as a "triangular sesamoid bone, about 5 cm. in diameter, situated at the front of the knee in the tendon of insertion of the quadriceps extensor femoris muscle. Called also *knee cap*." The Sloane-Dorland Annotated Medical-Legal Dictionary 535 (1987).

[4] "Meniscus, medial, of knee joint" is defined as a "crescent-shaped disk of fibrocartilage attached to the medial margin of the superior articular surface of the tibia." The Sloane-Dorland Annotated Medical-Legal Dictionary 442 (1987).

2011, Yadao had "increased symptoms in the left knee and pain with squatting, walking, kneeling, stair climbing and stair ascending or descending or prolonged standing."

In a report dated July 20, 2011, Dr. Goding wrote that Yadao's knee condition is consistent with the mechanics of the injury he described. Dr. Goding noted that Yadao's left knee condition on March 18, 2011, was related to the August 27, 2010 injury. In a report dated January 4, 2012, Dr. Goding clarified that Yadao's knee condition on March 18, 2011, was clearly an aggravation of the August 27, 2010 injury.

On July 20, 2011, Yadao filed a WC-5: Employee's Claim for Worker's Compensation Benefits for the August 27, 2010 date of injury. On the same day, Yadao filed a second WC-5: Employee's Claim for Worker's Compensation Benefits for the March 17, 2011 date of injury.[5] Yadao noted that "[i]t is possible the March 1[7], 2011 injury is a new injury or just part of the August 27, 2010 injury. Preserving Claimant's rights by filing for the March 1[7], 2011 injury." Yadao filed both WC-5 forms because the insurance carrier had not paid any benefits.

Upon receipt of Yadao's WC-5, the Department of Labor and Industrial Relations requested that Yadao file a WC-1 pursuant to HRS § 386-95 (2015). On or around July 29, 2011, Yadao filed a WC-1: Employer's Report of Industrial Injury for the March 17, 2011 injury. Yadao stated that the accident occurred while "performing trail maintenance the entire week on unleveled, hilly trails. On March 1[7], 2011, [he] felt pinching and poking sensation in the left knee similar to injury on August 27, 2010."

The Director held a hearing on August 2, 2011, to determine whether Yadao sustained an injury to his left knee arising out of and in the course of his employment on August 27, 2010. On September 16, 2011, the Director issued a decision

---

[5] It appears that Yadao mistakenly noted the date of injury as March 18, 2011. As mentioned previously, Yadao did not work on March 18, 2011 because it was a furlough day. The LIRAB's amended decision provides that the correct date of accident is March 17, 2011.

denying the workers' compensation claim. The Director concluded that Yadao did not sustain injury to his left knee arising out of and in the course of employment on August 27, 2010. The Director credited Dr. Richard Lewan (**Dr. Lewan**), Dr. Zimmerman, and Dr. Davenport's reports. Yadao appealed the decision to the LIRAB.

Upon DLNR's request, Dr. Smith performed an Independent Medical Examination (**IME**). The IME was conducted on September 20, 2011 and consisted of an examination and a medical records review. Dr. Smith diagnosed Yadao with "LEFT KNEE SYNOVITIS/EFFUSION. HISTORY OF MILD OSTEOARTHRITIS."[6] Dr. Smith wrote that Yadao did not sustain a new work injury, but reported worsening symptoms around March 17, 2011. Dr. Smith noted that "[c]ertainly, the relatively heavy walking activities that Mr. Yadao experiences during work could result in worsening symptoms of a preexisting condition." Dr. Smith noted that the preexisting condition appeared to be non-work related. Dr. Smith wrote that the findings of an MRI would indicate either "osteoarthritis and/or a medial meniscus tear."

Upon DLNR's request, Dr. Scoggin performed an Independent Review of Medical Records on February 13, 2012. Dr. Scoggin reviewed the reports of Kauai Medical Clinic, West Kauai Clinic, Dr. Zimmerman, Dr. Goding, Dr. Davenport, and Dr. Smith. Dr. Scoggin wrote that based on a review of the records, there is no clear evidence of an injury on March 17, 2011. Dr. Scoggin noted that the most likely clinical diagnoses is osteoarthritis of the left knee and degenerative medial meniscus tear of the left knee. Dr. Scoggin noted that the injuries on August 27, 2010, and March 17, 2011, did not appear to be similar "since one involved falling on both knees and the other involved feeling a

---

[6] "Synovitis" is defined as "inflammation of synovial membrane. It is usually painful, particularly on motion, and is characterized by a fluctuating swelling, due to effusion within a synovial sac." The Sloane-Dorland Annotated Medical-Legal Dictionary 699 (1987). "Effusion" is defined as "the escape of fluid into a part or tissue[.]" Id. at 240. "Osteoarthritis" is defined as "noninflammatory degenerative joint disease occurring chiefly in older persons, characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane. It is accompanied by pain and stiffness, particularly after prolonged activity." Id. at 515.

pinching and poking sensation in the left knee, without described trauma." Dr. Scoggin noted that an MRI of the left knee would seem "reasonable and appropriate, on a non-industrial basis" or through Yadao's private insurance.

The Director held a hearing on March 13, 2012, to determine whether Yadao sustained an injury to his left knee arising out of and in the course of his employment on March 17, 2011. In a decision filed on May 10, 2012, the Director concluded that Yadao sustained a compensable injury arising out of and in the course of his employment on March 17, 2011. The Director credited Dr. Goding's supplemental report dated January 4, 2012, and claimant's testimony. The Director noted that "matters of average weekly wage, temporary disability, permanent disability and/or disfigurement, if any, shall be determined at a later date." The Director entered an amended decision on June 5, 2012, correcting the date of the injury. The DLNR appealed the decision to the LIRAB.

On June 8, 2012, the DLNR filed a Motion for Stay of Director's Decision filed May 10, 2012, and the amended decision filed on June 5, 2012. The Director denied DLNR's motion for stay on July 30, 2012.

Upon DLNR's request, Dr. Clifford K.H. Lau (**Dr. Lau**) performed an IME on August 27, 2012. The IME consisted of a physical examination and a records review. Dr. Lau wrote that Yadao's knee condition is "related to the underlying osteoarthritis aggravated by his morbid obesity." Dr. Lau noted that Yadao weighed 280 pounds and had a body mass index of forty-four. Dr. Lau wrote that a body mass index in the mid-forties "would be in the extreme obese to morbidly obese range." Dr. Lau noted a direct correlation with obesity and degenerative arthritis of the knee. Dr. Lau wrote that there was no specific injury on or around March 17, 2011, but that Yadao may become symptomatic doing any type of walking up and down hills because of the underlying left knee osteoarthritis. Dr. Lau wrote that the underlying left knee osteoarthritis was not caused, aggravated, accelerated, or contributed to by activities on or

around March 17, 2011.

On August 6, 2012, the LIRAB issued its pretrial order setting various deadlines including a medical records submission deadline of September 4, 2012 and a hearing date of October 3, 2012. The parties stipulated and agreed to consolidate the appeals for the August 27, 2010 and March 17, 2011 date of injury claims.

The LIRAB hearing was held on October 3, 2012. The issues before the LIRAB were (1) whether Yadao sustained an injury to his left knee arising out of and in the course of his employment on August 27, 2010, and (2) whether Yadao sustained an injury to his left knee arising out of and in the course of his employment on March 17, 2011. At the hearing, the DLNR presented medical records from Dr. Zimmerman, Dr. Goding, Dr. Davenport, Dr. Smith, Dr. Scoggin, and Dr. Lau. Dr. Nadamoto and Yadao testified at the hearing.

Dr. Nadamoto testified that Yadao sustained chondromalacia patella injury on August 27, 2010, and a meniscal tear on March 17, 2011. Dr. Nadamoto testified that chondromalacia patella is a "condition in which the normal tracking surface of the patella against the femur trochlea is disrupted to the point where it is not tracking as smoothly as it should." In his report, Dr. Nadamoto noted a positive McMurray test.[7] Dr. Nadamoto testified that a McMurray test is a test used to indicate the possibility or probability of a meniscal injury. Dr. Nadamoto testified that sixty to seventy percent of people with positive McMurray tests have meniscal injuries. Dr. Nadamoto further explained that:

> [T]he anatomy of the knee is that as you go up or you step up, the femoral condyles come around and they then roll onto the meniscal rims at the -- in the posterior area. And then if you have a heavy load like you're crushing down on it, it could tear it, tear the meniscus. It's similar, although not quite the same, you see many of those old Japanese men just squatting in their yard. And then they get up and they

---

[7]    "Sign, McMurray" is defined as the "occurrence of a cartilage click during manipulation of the knee; indicative of a meniscal injury." The Sloane-Dorland Annotated Medical-Legal Dictionary 645 (1987).

go doc, after I got up, you know, I felt pain. The
same idea is they roll the condyles down onto the
meniscus. And then as they come up, they're pushing up
on it and it can tear the meniscus.
    But this is even more extreme 'cause he's not
just squatting down. He's carrying a heavy load and
then lifting that load up elevations.

Dr. Nadamoto testified that Yadao's thirty to
fifty-pound pack increased the possibility of a meniscal injury.
Dr. Nadamoto also testified that a patient's weight is a factor
in the development of a meniscal tear. Additionally, Dr.
Nadamoto testified that if an MRI had been taken shortly after
the March 2011 injury, then he may have been able to determine
whether Yadao's meniscal tear was caused by degeneration. Dr.
Nadamoto testified that if an MRI had been taken near the October
2012 trial date, then the MRI would likely reveal a chronic tear.

Yadao testified that he felt a poking sensation in his
left knee from August 2010 to March 2011. Yadao continued to
work after the August 27, 2010 injury because he was able to cope
with the pain by taking Aleve. Yadao also testified that the
pain he experienced around March 17, 2011, was in the same
location as his August 27, 2010 injury. Yadao stated that the
pain was located on the outside of his left knee. Yadao
testified that after March 17, 2011, the pain in his left knee
was excruciating. As of October 3, 2012, Yadao had not returned
to work due to the March 2011 injury. Following Yadao's
testimony, the LIRAB ordered the record closed except for filing
of post-hearing briefs due December 14, 2012.

On November 14, 2012, Yadao filed a Motion to File
After Trial the MRI Report of Claimant's Left Knee (**Motion to
File After Trial**). Yadao asserts that the MRI study could not be
performed or submitted to the LIRAB prior to the September 4,
2012 medical records submissions deadline and the October 3, 2012
trial. On August 6, 2012, Dr. Goding had submitted a treatment
plan for an MRI study of Yadao's left knee under the August 27,
2010 injury. On August 28, 2012, DLNR denied Yadao's request for
an MRI study of his left knee. On August 29, 2012, Dr. Goding
submitted a new treatment plan for an MRI study of Yadao's left

knee under the March 17, 2011 injury. The plan was approved by the DLNR on October 10, 2012. Yadao underwent an MRI on his left knee on October 16, 2012. The October 16, 2012 MRI report was not included in the Motion to File After Trial. The LIRAB denied Yadao's Motion to File After Trial on December 7, 2012.

On March 1, 2013, LIRAB issued its Decision and Order. The LIRAB's Findings of Fact (FOFs) and Conclusions of Law (COLs) included, *inter alia*:

> [FOF 25]: The Board finds that Employer has not presented substantial evidence to overcome the presumption of compensability with regard to the August 27, 2010 left knee chondromalacia patella work injury.

> [FOF 26]: The Board finds that Claimant sustained a chondromalacia patella injury to his left knee as a result of the August 27, 2010 work injury, as diagnosed by Dr. Nadamoto.

> [FOF 27]: The Board finds, however that Employer has presented substantial evidence to overcome the presumption of compensability with regard to the March 17, 2011 injury.

> [FOF 28]: The Board finds that Claimant's symptoms around March 17, 2011 continued to be attributable to the August 27, 2010 work injury. Claimant testified that the symptoms were in the same location. According to Dr. Nadamoto's testimony, Claimant would have had symptoms in a different location of his left knee if he had sustained a medial meniscal tear of his left knee.

> . . . .

> [COL 1]: The Board concludes that Claimant sustained an injury to his left knee in the form of chondromalacia patella arising out of and in the course of his employment on August 27, 2010.

> [COL 2]: The Board concludes that Claimant did not sustain an injury to his left knee arising out of and in the course of his employment on March 17, 2011.

On March 19, 2013, Yadao filed a Motion to Reopen Record and for Reconsideration with LIRAB. In the motion, Yadao requested that the LIRAB reopen the record, receive the October 16, 2012 MRI report and, if necessary, further testimony from Dr. Nadamoto. Yadao also requested that the LIRAB reconsider its Decision and Order. Yadao argued that the October 16, 2012 MRI report constituted clear and convincing evidence that he sustained a torn medial meniscal tear. The MRI report was attached to the Motion to Reopen Record and for Reconsideration.

In the MRI report, the impressions are noted as "1. BONE BRUISE MEDIAL FEMORAL CONDYLE. 2. PROBABLE PARTIAL TEAR OF THE LATERAL COLLATERAL LIGAMENT. 3. LARGE TEAR OF THE POSTERIOR HORN OF THE MEDIAL MENISCUS."

On April 18, 2013, DLNR filed a memorandum in opposition, contending that Yadao had not presented new evidence that could not have been presented at trial. DLNR argued that Yadao could have obtained the MRI under his private insurance prior to the September 4, 2012 medical report submissions deadline and the October 3, 2012 trial. DLNR also argued that Yadao should not be allowed to submit additional expert testimony from Dr. Nadamoto.

On May 9, 2013, the LIRAB heard arguments on Yadao's Motion to Reopen the Record and for Reconsideration, took the matter under advisement, and then issued an order denying Yadao's motion on the following day. The LIRAB did not provide its reasons for denying Yadao's motion in its May 10, 2013 Order.

Yadao timely filed a notice of appeal on May 24, 2013.

II. POINTS OF ERROR ON APPEAL

Yadao raises the following points of error:

(1) The LIRAB erred in crediting the opinions of Dr. Smith, in FOF 19,[8] where Dr. Smith's opinion failed to explain the objective signs of a meniscus tear he recognized might be shown by an MRI;

(2) The LIRAB erred in crediting the opinion of Dr. Scoggin, in FOF 20,[9] where Dr. Scoggin did not examine Yadao and failed to explain why the work duties Yadao described to him would not be a cause for a meniscus tear;

(3) The LIRAB erred in crediting the opinion of Dr. Lau, in FOF 21, where Dr. Lau's opinion ignored the positive McMurray Test as objective evidence of a tear and the work activities associated with a tear;

[8] FOF 19 in the LIRAB's Decision and Order refers to Dr. Scoggin's report. It appears that Yadao intended to cite to FOF 17.

[9] FOF 20 in the Decision and Order refers to Dr. Nadamoto's testimony. It appears that Yadao intended to cite to FOF 19.

(4) The LIRAB erred, in FOF 27, in finding that the DLNR had presented substantial evidence to overcome the presumption of compensability with regard to the March 17, 2011 injury;

(5) The LIRAB erred, in FOF 28, in finding that Yadao's symptoms around March 17, 2011, were attributable to his August 27, 2010 chondromalacia patella injury to his left knee;

(6) The LIRAB erred, in COL 2, in concluding that Yadao did not sustain an injury to his left knee arising out of and in the course of his employment on March 17, 2011; and

(7) The LIRAB erred in not reopening the record to receive the MRI report published after the close of the hearing as requested by Yadao both prior to the LIRAB's Decision and Order and after the Decision and Order.

III. APPLICABLE STANDARDS OF REVIEW

Appellate review of a LIRAB decision is governed by HRS § 91-14(g) (1993), which states that:

Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or
(2) In excess of the statutory authority or jurisdiction of the agency; or
(3) Made upon unlawful procedure; or
(4) Affected by other error of law; or
(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

We have previously stated:

FOFs are reviewable under the clearly erroneous standard to determine if the agency decision was clearly erroneous in view of reliable, probative, and substantial evidence on the whole record.

COLs are freely reviewable to determine if the agency's decision was in violation of constitutional or statutory provisions, in excess of statutory authority or jurisdiction of agency, or affected by other error of law.

> A COL that presents mixed questions of fact and
> law is reviewed under the clearly erroneous standard
> because the conclusion is dependent upon the facts and
> circumstances of the particular case. When mixed
> questions of law and fact are presented, an appellate
> court must give deference to the agency's expertise
> and experience in the particular field. The court
> should not substitute its own judgment for that of the
> agency.

Igawa v. Koa House Rest., 97 Hawai'i 402, 405-06, 38 P.3d 570, 573-74 (2001) (citations, internal quotation marks, and brackets omitted).

> An FOF or a mixed determination of law and fact is
> clearly erroneous when (1) the record lacks substantial
> evidence to support the finding or determination, or (2)
> despite substantial evidence to support the finding or
> determination, the appellate court is left with the definite
> and firm conviction that a mistake has been made. We have
> defined "substantial evidence" as credible evidence which is
> of sufficient quality and probative value to enable a person
> of reasonable caution to support a conclusion.

In re Water Use Permit Applications, 94 Hawai'i 97, 119, 9 P.3d 409, 431 (2000) (citations and internal quotation marks omitted).

> [An appellate court] generally reviews questions of
> statutory interpretation *de novo*, but, in the case of
> ambiguous statutory language, the applicable standard
> of review regarding an agency's interpretation of its
> own governing statute requires [courts] to defer to
> the agency's expertise and to follow the agency's
> construction of the statute unless that construction
> is palpably erroneous[.]

Gillan v. Gov't Emps. Ins. Co., 119 Hawai'i 109, 114, 194 P.3d 1071, 1076 (2008) (citations, internal quotation marks, brackets, and ellipses omitted).

> General principles of statutory construction apply in
> interpreting administrative rules. As in statutory
> construction, courts look first at an administrative
> rule's language. If an administrative rule's language
> is unambiguous, and its literal application is neither
> inconsistent with the policies of the statute the rule
> implements nor produces an absurd or unjust result,
> courts enforce the rule's plain meaning.

Panado v. Bd. of Trs., Emps.' Ret. Sys., 134 Hawai'i 1, 11, 332 P.3d 144, 154 (2014) (quoting Liberty Dialysis-Haw., LLC v. Rainbow Dialysis, LLC, 130 Hawai'i 95, 103, 306 P.3d 140, 148 (2013)).

A motion for reconsideration is reviewed under the abuse of discretion standard. Cho v. State, 115 Hawai'i 373, 381, 168 P.3d 17, 25 (2007) (quoting Ass'n of Apartment Owners of

Wailea Elua v. Wailea Resort Co., 100 Hawaiʻi 97, 110, 58 P.3d 608, 621 (2002)). This court stated that "[i]t has been consistently held that rehearings before administrative bodies are addressed to their own discretion, and only a showing of the clearest abuse of discretion could sustain an exception to that rule." Bocalbos v. Kapiolani Med. Ctr. for Women & Children, 93 Hawaiʻi 116, 126, 997 P.2d 42, 52 (App. 2000) (citation and internal quotation marks omitted). An abuse of discretion occurs if the trial court has "clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 74 Haw. 85, 114, 839 P.2d 10, 26 (1992).

IV.   DISCUSSION

A.   The LIRAB did not err in FOF 17 (Dr. Smith)

Yadao argues that the LIRAB erred in crediting the opinions of Dr. Smith because Dr. Smith's opinion failed to explain the objective signs of a meniscus tear he recognized might be shown by an MRI. "FOFs are reviewable under the clearly erroneous standard to determine if the agency decision was clearly erroneous in view of reliable, probative, and substantial evidence on the whole record." Igawa, 97 Hawaiʻi at 406, 38 P.3d at 574 (citations and brackets omitted).

It is well established that:

courts decline to consider the weight of the evidence to ascertain whether it weighs in favor of the administrative findings, or to review the agency's findings of fact by passing upon the credibility of witnesses or conflicts in testimony, especially the findings of an expert agency dealing with a specialized field.

Id. at 409-10, 38 P.3d at 577-78 (quoting In re Hawaiian Elec. Co., Inc., 81 Hawaiʻi 459, 465, 918 P.2d 561, 567 (1996)). In a worker's compensation case, the "credibility of witnesses and the weight to be given their testimony are within the province of the trier of fact and, generally, will not be disturbed on appeal." Tamashiro v. Control Specialist, Inc., 97 Hawaiʻi 86, 92, 34 P.3d 16, 22 (2001) (citation omitted).

As stated in his report, Dr. Smith diagnosed Yadao with "LEFT KNEE SYNOVITIS/EFFUSION. HISTORY OF MILD OSTEOARTHRITIS." Dr. Smith wrote that the findings of an MRI would indicate either "osteoarthritis and/or a medial meniscus tear." At trial, Yadao questioned Dr. Nadamoto about Dr. Smith's report. Dr. Nadamoto testified that Dr. Smith did not indicate whether he performed a McMurray test. Dr. Nadamoto testified that a McMurray test is a test used to indicate the possibility or probability of a meniscal injury and that sixty to seventy percent of people with positive McMurray tests have meniscal injuries. Dr. Nadamoto further testified that Dr. Smith found tenderness of the medial line joint which is consistent with but not the same as a McMurray test.

The LIRAB does not specifically "credit" Dr. Smith's opinion. FOF 17 merely reiterates Dr. Smith's report. Furthermore, it was within LIRAB's discretion to decide what weight to give Dr. Smith's report and Dr. Nadamoto's testimony. We decline to disturb LIRAB's assessment of the credibility of the witnesses and the weight it gives to the evidence. To the extent that it did so, we cannot conclude that the LIRAB erred in crediting the opinion of Dr. Smith.

B.    The LIRAB did not err in FOF 19 (Dr. Scoggin)

Yadao argues that the LIRAB erred in crediting the opinion of Dr. Scoggin because Dr. Scoggin did not examine Yadao and failed to explain why the work duties Yadao described to him would not be a cause for a meniscus tear.

Dr. Scoggin performed an independent review of medical records on February 23, 2012, and reviewed the reports of Kauai Medial Clinic, West Kauai Clinic, Dr. Zimmerman, Dr. Goding, Dr. Davenport, and Dr. Smith. Dr. Scoggin reported that the most likely clinical diagnoses are osteoarthritis of the left knee and degenerative medial meniscus tear of the left knee. Dr. Scoggin noted, *inter alia*, that an MRI of the left knee would seem "reasonable and appropriate, on a non-industrial basis" or through Yadao's private insurance. At the evidentiary hearing, Yadao questioned Dr. Nadamoto about Dr. Scoggin's degenerative

medial meniscus tear diagnosis. Dr. Nadamoto testified that "once you get chondromalacia, that is by definition a form of arthritis, early, mild." Dr. Nadamoto testified that if an MRI had been taken shortly after the March 17, 2011 injury, then he may have been able to determine whether Yadao's meniscal tear was caused by degeneration.

The LIRAB does not, in FOF 19, specifically "credit" Dr. Scoggin's opinion. It was nevertheless within LIRAB's discretion to decide what weight to give Dr. Scoggin's report and Dr. Nadamoto's testimony. We decline to disturb LIRAB's assessment of the credibility of the witnesses and the weight it gives to the evidence. Based on the record in this case, we cannot conclude that the LIRAB erred in crediting the opinion of Dr. Scoggin, in FOF 19.

C.    The LIRAB did not err in FOF 21 (Dr. Lau)

Yadao argues that the LIRAB erred in crediting the opinion of Dr. Lau because Dr. Lau's opinion ignored the positive McMurray Test as objective evidence of a tear and the work activities associated with a tear.

Dr. Lau performed an IME on August 27, 2012, which consisted of a physical examination and a records review. Dr. Lau reported that Yadao's knee condition was "related to the underlying osteoarthritis aggravated by his morbid obesity." Dr. Lau wrote that there was no specific injury on or around March 17, 2011, but that Yadao may become symptomatic doing any type of walking up and down hills because of the underlying left knee osteoarthritis. Dr. Lau opined that the underlying left knee osteoarthritis was not caused, aggravated, accelerated, or contributed to by activities on or around March 17, 2011.

Again, the LIRAB does not specifically "credit" Dr. Lau's opinion; rather, FOF 21 merely reiterates Dr. Lau's report. It was within LIRAB's discretion to decide what weight to give Dr. Lau's report. We again decline to disturb LIRAB's assessment of the credibility of the witnesses and the weight it gives to the evidence. Based on the record here, we cannot conclude that the LIRAB erred in crediting the opinion of Dr. Lau.

D.   The LIRAB's FOF 27 and FOF 28 are clearly erroneous

Yadao challenges FOF 27 and FOF 28 in the LIRAB's Decision and Order.[10]  In FOF 27, the LIRAB found that the DLNR had presented substantial evidence to overcome the presumption of compensability with regard to the March 17, 2011 injury.  In FOF 28, the LIRAB found that Yadao's symptoms around March 17, 2011, were attributable to his August 27, 2010 work injury.

In determining compensability of injuries by accident under the workers' compensation statutes, the Hawai'i Supreme Court has applied the "unitary" or "nexus" test.  Van Ness v. State of Haw., Dep't. of Educ., 131 Hawai'i 545, 560, 319 P.3d 464, 479 (2014) (citing Flor v. Holguin, 94 Hawai'i 70, 80, 9 P.3d 382, 392 (2000)).  This unitary test requires the "finding of a causal connection between the injury and any incidents or conditions of employment."  Tate v. GTE Hawaiian Tel. Co., 77 Hawai'i 100, 103, 881 P.2d 1246, 1249 (1994) (citing Chung v. Animal Clinic, Inc., 63 Haw. 642, 648, 636 P.2d 721, 725 (1981)).  The unitary requirement is set forth in HRS § 386-3(a) (1993 & Supp. 2014), which provides:

> If an employee suffers personal injury either by accident arising out of and in the course of the employment or by disease proximately caused by or resulting from the nature of the employment, the employee's employer or the special compensation fund shall pay compensation to the employee or the employee's dependents[.]

(Emphasis added).

Pursuant to HRS § 386-85 (2015), "it shall be presumed, in the absence of substantial evidence to the contrary . . . [t]hat the claim is for a covered work injury[.]"  The presumption "imposes upon the employer the burden of going forward with the evidence and the burden of persuasion."  Van Ness, 131 Hawai'i at 558, 319 P.3d at 477 (citing Akamine v. Hawaiian Packing & Crating Co., 53 Haw. 406, 408, 495 P.2d 1164, 1166 (1972)).  The employer may overcome the presumption "only [with] substantial evidence that [the injury] is unrelated to

---

[10]     Yadao's fourth and fifth points of error are related; thus, we address them together.

employment." Akamine, 53 Haw. at 408, 495 P.3d at 1166. The term "substantial evidence" "signifies a high quantum of evidence which, at the minimum, must be 'relevant and credible evidence of a quality and quantity sufficient to justify a conclusion by a reasonable [person] that an injury or death is not work connected.'" Nakamura v. State, 98 Hawai'i 263, 267-68, 47 P.3d 730, 734-35 (2002) (quoting Flor v. Holguin, 94 Hawai'i 70, 79, 9 P.3d 382, 391 (2000)). If the employer is unable to produce this "substantial evidence," then the presumption requires that the claimant prevail. Van Ness, 131 Hawai'i at 558, 319 P.3d at 477; Akamine, 53 Haw. at 409, 495 P.2d at 1166.

The supreme court has recognized that the high burden placed on the employer is consistent with the purpose of the workers' compensation law. Van Ness, 131 Hawai'i at 558, 319 P.3d at 477. "[T]he legislature has decided that work injuries are among the costs of production which industry is required to bear; and if there is reasonable doubt as to whether an injury is work-connected, the humanitarian nature of the statute demands that doubt be resolved in favor of the claimant." Korsak v. Haw. Permanente Med. Grp., 94 Hawai'i 297, 307, 12 P.3d 1238, 1248 (2000) (citing Akamine, 53 Haw. at 409, 495 P.2d at 1166).

With regard to a claim for compensation due to an alleged compensable consequence of a work-related injury, HRS § 386-85 creates a presumption in favor of the claimant that the subsequent injury is causally related to the primary injury. Korsak, 94 Hawai'i at 307, 12 P.3d at 1248. The supreme court has recognized that: "Generally, 'a subsequent injury, whether an aggravation of the original injury or a new and distinct injury, is compensable if it is the direct and natural result of a compensable primary injury.' 1 A. Larson, *The Law of Worker's Compensation* § 13.11, at 3-503 (1993)." Davenport v. City & Cnty of Honolulu, 100 Hawai'i 297, 310, 59 P.3d 932, 945 (App. 2001) (quoting Diaz v. Oahu Sugar Co., 77 Hawai'i 152, 155, 883 P.2d 73, 76 (1994)). The test for determining whether a subsequent injury is a direct and natural result of the original compensable injury is: "(1) whether any causal connection exists between the

original and subsequent injury; and, if so, (2) whether the cause of the subsequent injury is attributable to some activity that would be customary in light of the claimant's condition." Diaz, 77 Hawai'i at 156, 883 P.2d at 77.

Furthermore, the supreme court has recognized that "generalized" medical testimony concerning the cause of an injury is insufficient to rebut the presumption of compensability. Nakamura, 98 Hawai'i at 268, 47 P.3d at 735 (citing Akamine, 53 Haw. at 410-12, 495 P.2d at 1167-68). In Akamine, the claimant collapsed while pushing a hand truck at work. Akamine, 53 Haw. at 407, 495 P.2d at 1165. One of the experts testified that there was no connection between claimant's death and employment based on his belief that "heart diseases originate early in life and that [claimant's] pre-existing pathological condition was the sole cause of death." Id. at 410-11, 495 P.2d at 1167. The supreme court held that the employer had failed to present substantial evidence to overcome the presumption that a causal connection existed between claimant's death and employment activity. Id. at 414, 495 P.2d at 1169. The supreme court noted that:

> To allow a medical expert to give his opinion as to whether legal causation existed in a particular case could lead to an unjust result. For a medical man may give a generalized opinion that there was no connection between an incident at work and a heart attack, and, in his own mind, may mean thereby that a pre-existing pathological condition was the overwhelming factor in bringing about the attack and that the part played by the work was insignificant. But, while it may be sound medically to say that the work did not cause the attack, it may be bad law, because, an [sic] general, existing law treats the slightest factor of aggravation as an adequate cause.

Id. at 410, 495 P.2d at 1167 (emphasis added; citations and internal quotation marks omitted).

Since Akamine, the supreme court has held that "the slightest aggravation or acceleration of an injury by the employment activity mandates compensation." Van Ness, 131 Hawai'i at 562, 319 P.3d at 481 (citing De Fries v. Ass'n of Owners, 999 Wilder, 57 Haw. 296, 309, 555 P.2d 855, 862 (1976) (holding that claimant was entitled to recover for injuries

resulting from a stumble that aggravated or accelerated the arthritic condition of his knee)). In Van Ness, claimant alleged that the aggravation of his asthma resulting from exposure to volcanic smog (**vog**) at his place of employment was a compensable injury by disease. Id. at 559, 319 P.3d at 478. The supreme court noted that the employer had failed to present substantial evidence to overcome the presumption that the aggravation of claimant's asthma was an injury "by disease proximately caused by" his employment. Id. at 565, 319 P.3d at 484. The supreme court held that the aggravation of claimant's asthma was causally connected to the "incidents or conditions" of his employment and therefore compensable under the workers' compensation statutes. Id. at 564, 319 P.3d at 483 (citing Chung v. Animal Clinic, Inc., 63 Haw. 642, 648, 636 P.2d 721, 725 (1981)).

As a threshold matter, the LIRAB's finding that Yadao had sustained a chondromalacia patella injury on August 27, 2010 was not challenged by either Yadao or DLNR. Therefore, that fact is binding upon the appellate court. State v. Kiese, 126 Hawai'i 494, 502, 273 P.3d 1180, 1188 (2012).

The LIRAB found, in effect, that Yadao sustained a primary compensable injury on August 27, 2010. Once a primary compensable injury is found, HRS § 386-85 created a presumption that the subsequent injury is causally related to the primary injury. Thus, it is presumed that Yadao's March 17, 2011 claim is compensable if it is the direct and natural result of the primary injury. This presumption will hold regardless of whether the March 17, 2011 claim is for a new injury or an aggravation of the primary injury. The DLNR may overcome the presumption only with substantial evidence that the March 17, 2011 claim is unrelated to Yadao's employment.

There is evidence in the record that Yadao's employment with DLNR involved strenuous activity. During the week of March 14, 2011, Yadao was performing trail maintenance for approximately four hours a day on the Nualolo trail, including cutting grass, brushing sides, and picking up branches off the trail. Yadao carried a thirty- to fifty-pound backpack while

performing trail maintenance.

Additionally, Dr. Nadamoto explained his meniscal tear diagnosis at the hearing. Dr. Nadamoto stated:

> Now, the anatomy of the knee is that as you go up or you step up, the femoral condyles come around and they then roll onto the meniscal rims at the -- in the posterior area. And then if you have a heavy load like you're crushing down on it, it could tear it, tear the meniscus. It's similar, although not quite the same, you see many of those old Japanese men just squatting in their yard. And then they get up and they go doc, after I got up, you know, I felt pain. The same idea is they roll the condyles down onto the meniscus. And then as they come up, they're pushing up on it and it can tear the meniscus.
> But this is even more extreme 'cause he's not just squatting down. He's carrying a heavy load and then lifting that load up elevations.

The DLNR argues that it presented "substantial, credible and persuasive evidence to show that [Yadao's] work activities on or about March 17, 2011 did not cause, aggravate, or accelerate his left knee condition." The evidence offered by DLNR to rebut the statutory presumption included Dr. Smith and Dr. Lau's opinions. Dr. Smith wrote, however, that Yadao's heavy walking activities at work could result in the worsening symptoms of a preexisting condition. Dr. Smith also noted that the preexisting condition appeared to be non-work related. Dr. Lau opined that Yadao's left knee condition was related to underlying osteoarthritis aggravated by his morbid obesity. Dr. Lau noted that Yadao may become "symptomatic doing any type of walking up and down hills because of the underlying osteoarthritis of his left knee." Dr. Lau summarily concluded that the underlying left knee osteoarthritis was not caused, aggravated, accelerated, or contributed to by activities on or around March 17, 2011.

Dr. Smith and Dr. Lau's reports constitute generalized opinions that Yadao's employment activity worsened a preexisting non-work related condition. Such "generalized" medical opinions concerning the cause of an injury are insufficient to rebut the presumption of compensability. Nakamura, 98 Hawai'i at 268, 47 P.3d at 735 (citing Akamine, 53 Haw. at 410-12, 495 P.2d at 1167-68). "The primary focus of the medical testimony should have been a discussion on whether the employment effort, whether great

or little, in any way aggravated" Yadao's left knee condition. Akamine, 53 Haw. at 412, 495 P.2d at 1168. The existing law treats the slightest aggravation or acceleration of an injury as adequate cause. Id. at 410, 495 P.2d at 1167. The LIRAB failed to make any findings with respect to whether Yadao's employment activity aggravated or accelerated his left knee condition. Nevertheless, "doubt as to the cause of the injury represents a salient index of the absence of substantial evidence required to overcome the presumption that the claim is compensable." Van Ness, 131 Hawai'i at 564, 319 P.3d at 483 (citing Akamine, 53 Haw. at 414, 495 P.2d at 1169) (emphasis added; internal quotation marks omitted). We conclude that the DLNR did not present substantial evidence that Yadao's March 17, 2011 injury was unrelated to his employment. As such, the LIRAB's FOF 27 is clearly erroneous.

In FOF 28, the LIRAB found that Yadao's symptoms around March 17, 2011, continued to be attributable to his August 27, 2010 injury. The LIRAB compared Yadao's testimony that his symptoms were in the same location with Dr. Nadamoto's testimony that Yadao would have had symptoms in a different location if he sustained a meniscal tear. However, the LIRAB failed to consider the entirety of the record. Although Yadao testified that the pain he experienced around March 17, 2011, was in the same location as the August 27, 2010 injury, there is support in the record to indicate that the pain of the March 17, 2011 injury was more severe. Dr. Nadamoto explained that the difference between chondromalacia patella symptoms and meniscus tear symptoms would be the location and severity of pain. Yadao testified that he had been able to cope with the pain from the August 27, 2010 injury by taking Aleve, but that after March 17, 2011, the pain in his left knee was excruciating.

As of October 3, 2012, Yadao had not returned to work due to the March 17, 2011 injury.[11]

Based on the LIRAB's conclusion that Yadao did not sustain a compensable injury on March 17, 2011, the LIRAB presumably found that Yadao's symptoms around March 17, 2011, were a continuation of the August 27, 2010 injury. The LIRAB further determined that Yadao's March 17, 2011 injury was not a compensable consequence of his primary August 27, 2010 injury. However, this determination is based on the flawed belief that the DLNR presented substantial evidence to rebut the presumption of compensability. On the contrary, the DLNR failed to present substantial evidence that the March 17, 2011 claim is unrelated to Yadao's employment activity. In our view, there is reasonable doubt as to whether Yadao's employment activity aggravated or accelerated his left knee condition. We recognize that when there is "reasonable doubt as to whether an injury is work-connected, the humanitarian nature of the statute demands that doubt be resolved in favor of the claimant." Korsak, 94 Hawai'i at 307, 12 P.3d at 1248 (citing Akamine, 53 Haw. at 409, 495 P.2d at 1166). We conclude that the LIRAB's FOF 28 was clearly erroneous.

E.    The LIRAB's COL 2 was wrong

Yadao challenges COL 2 in the LIRAB's Decision and Order, wherein the LIRAB concluded that Yadao did not sustain an injury to his left knee arising out of and in the course of his employment on March 17, 2011.

It appears that FOF 27 and FOF 28 served as the basis for its conclusion that Yadao did not sustain a compensable injury on March 17, 2011. As we have concluded that FOF 27 and FOF 28 are clearly erroneous, COL 2 is wrong and LIRAB's Decision and Order as to its determination on the compensability of the March 17, 2011 date of injury must be vacated and remanded for further proceedings.

---

[11]    The record includes a report that Yadao eventually returned to his "regular duties in October 2013, working full-time without job modification."

F.    <u>The LIRAB abused its discretion when it denied Yadao's Motion to Reopen Record and for Reconsideration</u>

Yadao argues that the LIRAB erred when it denied his Motion to File After Trial and Motion to Reopen Record and for Reconsideration. Yadao's Motion to File After Trial was filed prior to the LIRAB's Decision and Order. However, Yadao's Motion to Reopen Record and for Reconsideration was filed after the LIRAB's Decision and Order.

In the Motion to File After Trial, Yadao requested leave to file an MRI report after the medical submissions deadline. Hawai'i Administrative Rules (**HAR**) § 12-47-22 (West 2015) provides that the LIRAB "may enter a pretrial order" establishing discovery deadlines. A medical submission deadline is the date that all medical reports or records shall be filed with the LIRAB. HAR § 12-47-22(b)(3). The LIRAB has wide discretion to control the admission or exclusion of evidence.

> The [LIRAB] shall not be bound by statutory and common law rules relating to the admission or rejection of evidence. The [LIRAB] may exercise its own discretion in these matters, limited only by considerations of relevancy, materiality, and repetition, by the rules of privilege recognized by law, and with a view to securing a just, speedy, and inexpensive determination of the proceedings.

HAR § 12-47-41 (West 2015). This court has previously recognized, in unpublished decisions, that the LIRAB's evidentiary rulings should be upheld absent an abuse of discretion. <u>See</u> <u>Tautua v. BCI Coca-Cola Bottling Co.</u>, No. 30291, 2012 WL 2308162 (Haw. App. June 18, 2012) (SDO); <u>Athens v. Int'l Archaeological Research Inst., Inc.</u>, No. 29495, 2011 WL 5997078 (Haw. App. Nov. 30, 2011) (SDO); <u>Sugano v. State Dep't of Attorney Gen.</u>, No. 29246, 2010 WL 231100 (Haw. App. Jan. 22, 2010) (SDO).

We conclude that it was within the LIRAB's discretion to exclude untimely discovery in this case. In its pretrial order, the LIRAB set the medical records submission deadline of September 4, 2012. At the end of hearing, the LIRAB closed the record except for the filing of post-trial memorandums. Yadao argues that he was not able to submit the MRI report prior to the

medical submission deadline and hearing because DLNR did not approve the MRI treatment plan until October 10, 2012. Although Yadao provided a reasonable explanation for the untimely MRI report, nevertheless, we cannot conclude that the LIRAB "clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." Amfac, 74 Haw. at 114, 839 P.2d at 26.

However, in his Motion to Reopen Record and for Reconsideration, Yadao again requested that the LIRAB reopen the record, receive the October 16, 2012 MRI report, and if necessary, further testimony from Dr. Nadamoto. Yadao further requested that the LIRAB reconsider its Decision and Order.

The LIRAB's ruling on a motion to reopen the record is governed by HAR § 12-47-41. The LIRAB's ruling on a motion for reconsideration is governed by HAR § 12-47-53 (West 2015)[12] and HRS § 386-87(d)(2015). HRS § 386-87(d) states in relevant part, "the [LIRAB] may, upon the application of the director or any other party . . . reopen the matter and thereupon may take further evidence or may modify its findings, conclusions or decisions." In Bocalbos, this court noted that the term "may" implies discretion on the part of the LIRAB. Bocalbos, 93 Hawai'i at 126, 997 P.2d at 52. As such, a motion for reconsideration by the LIRAB is reviewed for abuse of discretion. Id. The appellate courts have recognized that:

> [T]he purpose of a motion for reconsideration is to allow the parties to present new evidence and/or arguments that could not have been presented [in an] earlier adjudicated motion. Reconsideration is not a device to relitigate old matters or to raise arguments or evidence that could and should have been brought during the earlier proceeding.

---

[12]     HAR § 12-47-53 states, in relevant part:

> (a) In the absence of an appeal and within thirty days after mailing of a copy of the board's decision or order, the board may, upon the request of any party, or upon its own motion, reconsider or reopen the matter. If reopening is allowed, the board may take further evidence or may modify its decision or order.

Sousaris v. Miller, 92 Hawai'i 505, 513, 993 P.2d 539, 547 (2000) (citations and internal quotation marks omitted).

DLNR contends that Yadao has not presented new evidence or arguments to support his request to reopen the record and for reconsideration, asserting that Yadao could have obtained the MRI under his private insurance prior to the September 4, 2012 medical report submissions deadline and the October 3, 2012 trial. However, the fact that the MRI report violated the medical reports submission deadline is not dispositive of Yadao's request to "take *further evidence* or [to] modify its findings, conclusion or decisions as allowed by HRS § 386-87(d) (1985)." Bocalbos, 93 Hawai'i at 127 n.27, 997 P.2d at 53 n.27 (internal quotation marks omitted).

Here, Yadao provided a reasonable explanation for the delay in obtaining the MRI study of his left knee. On August 6, 2012, Dr. Goding submitted a treatment plan for an MRI study of Yadao's left knee under the August 27, 2010 injury claim. The DLNR denied Yadao's request for an MRI study of his left knee on August 28, 2012. On August 29, 2012, Dr. Goding submitted a new treatment plan for an MRI study of Yadao's left knee under the March 17, 2011 injury claim. The plan was approved by DLNR on October 10, 2012. Accordingly, DLNR's argument that the MRI report does not constitute new evidence because it could have been obtained prior to the medical submissions deadline is not convincing.

The central issue at the October 3, 2012 hearing was whether Yadao sustained an injury to his left knee arising out of and in the course of his employment on March 17, 2011. The evidence presented at the hearing consisted of medical reports and testimony. The record indicates that Dr. Goding, Dr. Smith, Dr. Scoggin, and Dr. Nadamoto recognized the importance of an MRI. In a report dated April 4, 2011, Dr. Goding noted severe medial joint line tenderness on Yadao's left knee and diagnosed Yadao with a medial meniscus tear. Dr. Goding noted "[w]e will organize an MRI and see him back." Dr. Smith wrote that the findings of an MRI would indicate either "osteoarthritis and/or a

medial meniscus tear." Dr. Scoggin noted that an MRI of the left knee would seem "reasonable and appropriate, on a non-industrial basis" or through Yadao's private insurance.

At the hearing, Dr. Nadamoto testified that Yadao sustained chondromalacia patella injury on August 27, 2010 and a meniscal tear on March 17, 2011. Yadao's positive McMurray test supported Dr. Nadamoto's meniscal tear diagnosis. Dr. Nadamoto testified that if an MRI had been taken shortly after the March 2011 injury, then he may have been able to determine whether Yadao's meniscal tear was caused by degeneration and that if an MRI had been taken near the October 2012 trial date, then the MRI would likely reveal a chronic tear. Based on the evidence presented at the hearing, the LIRAB concluded that Yadao had not sustained an injury arising out of and in the course of his employment on March 17, 2011.

In reaching its conclusion, the LIRAB clearly declined to find that Yadao had sustained a meniscal tear injury on March 17, 2011. Yadao asserts that the MRI report presents important new evidence. The MRI report notes impressions as "1. BONE BRUISE MEDIAL FEMORAL CONDYLE. 2. PROBABLE PARTIAL TEAR OF THE LATERAL COLLATERAL LIGAMENT. 3. LARGE TEAR OF THE POSTERIOR HORN OF THE MEDIAL MENISCUS." Thus, the MRI report constitutes objective evidence of a meniscal tear injury that reasonably could not have been presented at the original hearing.

Despite the significance of the MRI report to the LIRAB's determination, the LIRAB provides no explanation for denying the Motion to Reopen and for Reconsideration. Although the LIRAB has wide discretion in managing evidence, the equities of this case, and the overriding purpose of Hawai'i's workers' compensation scheme, required the LIRAB to reopen the record and consider the MRI report. We conclude that the LIRAB abused its discretion when it denied Yadao's Motion to Reopen Record and for Reconsideration. Therefore, we vacate the LIRAB's May 10, 2013 Order and remand for further proceedings, including that the LIRAB consider the MRI report.

V.    CONCLUSION

For the foregoing reasons, we vacate (1) the LIRAB's determination of Yadao's March 17, 2011 claim and (2) the LIRAB's May 10, 2013 Order; we remand this case for further proceedings consistent with this Opinion.    In all other respects, we affirm the LIRAB's Decision and Order and the December 7, 2012 Order.

On the briefs:

Rebecca L. Covert,
Davina W. Lam,
(Takahashi and Covert),
for Claimant-Appellant.

Shawn L.M. Benton,
(Leong Kunihiro Lezy &
 Benton),
for Employer-Appellee,
Self-Insured.